THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF
NEW YORK, Appellant and Respondent, *v.* JOHN H. STARIN
et al., Respondents  THE INDEPENDENT STEAMBOAT COM-
PANY, Appellant.

Any person who invades the rights of the owner of a ferry franchise by
running a ferry himself, is liable for any damages he thus causes the
owner and may be restrained by the court.

*It seems,* however, the courts will not restrain the operation of a ferry
which is demanded by the public convenience simply because the fran-
chise belongs to another, who neglects or refuses to use it.

A ferry is the continuation of a highway from one side of the water over
which it passes to the other, and is for the transportation of passengers
or of travelers with their teams and vehicles and such other property
as they carry or have with them.

A ferry franchise does not include the carrying of freight and merchan-
dise without the presence of the owners; this is the business of a
common carrier and may be done without interference with such
franchise.

A ferry franchise is property, and the sovereign power may make an
irrevocable perpetual grant of it. the same as of any other property.

By the Montgomerie charter the city of New York received, not simply
the political right to establish and regulate ferries, but the property in
the ferry franchises from the "Island Manhattan's to any of the oppo-
site shores all around the same island." The words " opposite shores "
were not intended to limit the right granted to ferries from some point
in the city to a point diametrically opposite, but the purpose was to
secure to the city all the ferry franchises to and from it.

Accordingly *held,* that the grant included the ferry franchises and the
exclusive right to control and receive the revenues of all ferries between
the city and Staten Island.

SICKLES—VOL. LXI.    1

The rule requiring all gratuitous grants by the sovereign of exclusive privileges and franchises to be construed strictly, and that any ambiguity therein must operate against the grantee, is not in its strictness fully applicable to the grant of a ferry franchise. Such a grant is never without a consideration, as it imposes upon the grantee the obligation of maintaining a ferry, with suitable accommodations, for the convenience of the public.

The rule also does not apply to the grants under said charter, as by the terms of the charter itself it is in all things to "be construed * * * benignly and in favor of and for the most and greatest advantage, profit and benefit" of the city.

While, if a practical construction by the parties interested, of ambiguous language in such a grant, as evidenced by their acts, has been uniform, it is entitled to great, if not controlling weight, if it has not been uniform, and such acts indicate conflicting views, they furnish no aid in arriving at the meaning.

The omission of the city to assert its rights under the charter, or passive submission to the invasion thereof, *held* to have but little bearing in the construction of the grant; but that the acts of the city in asserting and exercising its rights from time to time, claiming the exclusive franchise, conclusively showed its understanding of its rights under the charter.

*It seems* that the various statutes creating corporations to operate ferries between the city and Staten Island (Chap. 182, Laws of 1839; Chap. 363, Laws of 1845; Chap. 257, Laws of 1848), give no right to the corporations so organized to interfere with the franchises of the city, and before they could lawfully operate their ferries they were bound to acquire the right from the city.

Also, *held*, that where lessees from the city were engaged in operating ferries between the city and Staten Island, it was no defense in an action against one operating such a ferry in violation of the rights of the city, that it had not lawfully established a ferry to said island or executed a legal lease; that a mere wrong-doer was not in a position to assail the action of the city, and could not appropriate its franchises because it had not in the management of them observed the provisions of its charter; and that it was sufficient to authorize a judgment restraining such an invasion of its rights for the city to show that ferries, adequate for the public convenience, were in fact established and operated; and so, that its duties to the public as owner of the franchises had been discharged.

Also, *held*, the fact that the defendant in such an action had a coasting license did not give it authority to invade the ferry franchises of the city.

Also, *held*, that persons who had merely chartered steamboats to the company operating the unlawful ferry, to be used in the business, did not violate the rights of the city and were not proper parties to the action.

Also, *held,* that others who were mere servants or agents of said company, while they might in the discretion of the court be joined as defendants, were not necessary parties, and that this court could not review a dismissal of the complaint as to them.

(Argued April 28, 1887; decided June 7, 1887.)

THESE were cross appeals from a judgment of the General Term of the Superior Court, entered upon an order made December 16, 1886, which affirmed a judgment in favor of plaintiff against defendant, the Independent Steamboat Company, and against plaintiff in favor of the other defendants, entered upon a decision of the court on trial at Special Term.

The nature of the action and the material facts are stated in the opinion.

*Noah Davis, James McNamee* and *Adolph L. Pincoffs* for defendant, appellant.    Where an ancient document, such as a grant affecting public rights or interests is to be construed, and there exists any difference of opinion as to its extent and meaning, contemporaneous construction by official acts, or omissions to act, or in grants affecting the same subject matter, or usage or admissions, form the best and most convincing authority to which appeal can be made for a correct interpretation.    (Dwarris on Statutes, 693 ; *People* v. *Mauran,* 5 Den. 389, 396 ; *People* v. *Dayton,* 55 N. Y. 375 ; *Canajos* v. *Trevino,* 6 Wall. 785 ; *Goodyear* v. *Cary,* 4 Blatchf. 271 ; *Smith* v. *People,* 47 N. Y. 339 ; *Easton* v. *Pickersgill,* 55 id. 315 ; *Knapp* v. *Warner,* 57 id. 668 ; *Drummond* v. *Attorney-General,* 2 H. of L. Cases, 681.)    Any ambiguity in a grant of privileges must operate against the grantee and in favor of the public. (*Mayor, etc.,* v. *Broadway R. R. Co.,* 97 N. Y. 281 ; *Langdon* v. *Mayor, etc.,* 93 id. 14, 8 ; *Mills* v. *St. Clair Co.,* 8 How. [U. S.], 569 ; *Fanning* v. *Gregoire,* 16 id. 524 ; *Auburn & Cato P. R.* v. *Douglass,* 9 N. Y. 44 ; *Chas. River Bridge* v. *Warren Bridge,* 11 Pet. 545 ; *Letton* v. *Goode,* 14 Law T. Rep. (N. S.), 298 ; *Martin* v. *Waddell,* 16 Pet. 411 ; *East Hartf.* v. *Hartf. Co.,* 10 How. [U. S.], 531 ; *People ex rel. McCarthy* v. *French,* 10 Abb. [N. C.], 418 ; *Gutzweiller* v. *People,* 14 Ill. 142 ; *People* v. *Mayor, etc.,* 32 Barb. 102.)    The legislature of the State has

not regarded the Montgomerie charter as conferring power on the city of New York to establish ferries to and from Staten Island. (Laws of 1845, chap. 363; Laws of 1848, chap. 257; Laws of 1839, chap. 182.) A ferry to an opposite shore and its franchises are lawful. It is not necessary that the same party shall have a right of ferriage both ways. It is only necessary that the grantee have or acquire a right of landing on the shores. (*Conway* v. *Taylor's Exr's.* 1 Black. 603; *People* v. *Babcock*, 11 Wend. 587; *Powers* v. *Athens*, 99 N. Y. 592.) A grant of a ferry to an island does not carry the whole island and all its franchises to the grantee. (*Newton* v. *Cabbitt*, 12 C. B. [N. S.], 32 ; 13 id. 864; *Chas. River Bridge* v. *Warren Bridge*, 11 Pet. 471.) A mere grant of a ferry by general terms, must, from its nature, be confined to the landing places and the route through the water between them. (1 Ruff. 8 c. 30; 2 Inst. 58; 1 Mod. 104; Willes, 206, 1 Selk. 357; 2 Amst. 614; 10 Price, 369, 410, 453; 1 Dow. P. C. 322; *Hopkins* v. *G. N. Riv. Co.* L. R. 2 Q. B. D., 224; *Price* v. *Knott*, 8 Or. 443 ; *Matthews* v. *Peache*, 5 E. & B. 566.) The lease to the Rapid Transit Railroad Company is not only void for transcending the power of the city to grant and of the company to take, and because it gives the right to run ferries to no defined landing and to no terminus of the railroad company, but also because it attempts to create a monopoly altogether beyond that of a ferry, which cannot lawfully be done by the city. (Burrill's Law Dict. ; *Charles River Bridge Case*, 11 Pet. 620, 622 ; *Alexandria Ferry Co.* v. *Wisch*, 73 Mo. 657 ; *Hartford Bridge Co.* v. *Union Ferry Co.* 29 Conn. 210 ; *Mills* v. *Learn*, 2 Or. 215 ; *Prise* v. *Knott*, 8 id., 438 ; *Letton* v. *Goode*, 14 L. T. [N. S.] 298 ; *Wyckoff* v. *Queens County Ferry Co.* 52 N. Y. 32 ; *White* v. *Winnisimmet Co.*, 7 Cush. 155 ; *The Garden City*, 26 Fed. Rep. 766, 770 ; *Langdon* v. *Mayor, etc.*, 93 N. Y. 155 ; *Hopkins* v. *Gt. N. R. Co.*, L. R., 2 Q. B. D. 224.) General commerce between States or portions of States is not to be restricted or limited because some one has a ferry right which may be or has been incidentally affected by such commerce.

(*Conway* v. *Taylor's Ex'rs*, 1 Black. 603.)  No injunction can be granted in this suit unless the case of the complaint is made, and no penal law of the State binds the hands or shuts the mouths of the appellants from asserting any and every defense in their power to make or confer any right of action on the respondents. (*Charles River Bridge* v. *Warren Bridge*, 11 Pet. 623.)

*James C. Carter* for plaintiff.  An actually existing ferry between designated points is a piece of property susceptible of seizin or possession.  The plaintiffs were, by their license, in possession, under color, at least, of title, and with no objection on the part of the State.  The defendants had no color of title.  No one can run a ferry without the license of the State. (*Power* v. *Athens*, 99 N. Y. 592; *Chenango Bridge Co.* v. *Paige*, 83 id. 178.)  A possessory action at law for damages for disturbing a ferry, would not afford complete relief. (*Blissert* v. *Hart*, Willes, 508; *Peter* v. *Kendal*, 6 B. & C. 703.)  The gift and the control of such franchises is within the reserved authority of the States. (*Conway* v *Taylor's Ex'r*, 1 Black. 603; *Gibbons* v. *Ogden*, 9 Wheat. 1.)  Any exercise by the city of New York of the power by the Montgomerie charter conferred to establish future ferries would be valid. (*Coster* v. *Brush*, 25 Wend. 628; *Aiken* v. *Western R. Co.* 20 N. Y. 370.)  The power to establish future ferries must still subsist in the sovereign, being a governmental power and duty which cannot be surrendered. (*People* v. *Mayor, etc.*, 32 Barb. 102.)  It is exclusive by its very nature, whether so declared by their grant or not. (*Chas. River Bridge Co.* v. *Warren Bridge*, 13 Pet. 420, 620.)  Where governmental powers are accompanied by grants of property, or property rights, they are not subject to revocation. (*Aiken* v. *Western R. Co., supra; Benson* v. *Mayor, etc.*, 10 Barb. 223; 1 Hoffman's Estate and Rights of New York, 273; *Mayor, etc.* v. *N. E. Transfer Co.* 14 Blatch. 189; Kent's Notes to City Charter, note 30.)  A ferry is a highway, and the establishment of it is both a governmental franchise and a

governmental duty. (Woolrych on Ways, 217.) The words "opposite shores," as used in the Montgomerie charter, mean surrounding shores. (*Hussey* v. *Field*, 1 Gale, 165, 169, 1 Abb. Law. Dic., 491.) Such a grant as was made to the city by the Montgomerie charter must be construed in the mode best calculated to secure its public objects. (*In re Alton Woods*, 4 Rep. 45.)

*W. W. MacFarland* for plaintiff. A franchise of ferry is an incorporeal hereditament, and, in judgment of law, real property. (*Conway* v. *Taylor's Ex.*, 1 Black. 603, 632; 3 Kent's Comm. side page 458; *Patrick* v. *Ruffners*, 2 Rob. 209; *Aiken* v. *West. R. R. Corp.*, 20 N. Y. 370, *Smith* v. *Harkins*, 2 Ired. Eq. 613; *In re Fay*, 15 Pick. 252; 2 Wash. on Real Prop., 269; *Doty* v. *Gorham*, 5 Pick. 487; *Chambers* v. *Fury*, 1 Yates, 16; *Cooper* v. *Smith*, 9 Serg. & R. 26; *Mayor, etc.* v. *N. Y. & S. I. Ferry Co.*, 40 Supr. Ct. 245, 246.) Incorporeal property, such as a franchise of a ferry, admits, in legal intendment of the same exclusive possession as tangible property, whether real or personal, and in all cases what in law amounts to possession depends in the main upon the nature of the property and of its use. (*Beahpland* v. *McKeen*, 28 Pa. 124; 70 Am. Dec. 715; *Hamilton* v. *Scull*, 25 Mo. 165; 69 Am. Dec. 460; *Ford* v. *Wilson*, 35 Miss. 490; 72 Am. Dec. 137.) Possession as against an intruder constitutes title. (Holmes on Com. Law, 244; Phillimore, Private Law among the Romans, 114; *Corp. of Hastings* v. *Ivall*, L. R. 19 Eq. 598; 13 Moak's Eng. Dec. 501, 525; *Alexander* v. *Hard*, 64 N. Y. 228; *Littlejohn* v. *Attrill*, 94 id. 619; *Tate* v. *Southard*, 3 Hawks, 119; 14 Am. Dec. 578; *Green* v. *Kellum*, 23 Penn. St. 254; 62 Am. Dec. 332; *Watson* v. *Gregg*, 10 Watts, 589; 36 Am. Dec. 176; *Conyers* v. *Keenan*, 4 Ga. 308; 48 Am. Dec. 226; *Beverly* v. *Burke*, 9 Ga. 440; 54 Am. Dec. 351; *Dyson* v. *Collick*, 5 B. & Ald. 328; *Corp. of Hastings* v. *Ivall* L. R., 19 Eq. 558; 13 Moak's Eng. Dec. 501.) The plaintiffs were in possession. (*Ogden* v. *Gibbons*, 4 Johns. Ch. 160;

3 Blackst. Com. 229 ; 2 Washb. on R. Prop. 270.) Ancient grants are interpreted by modern usage. (*Beaufort* v. *Corp. of Swansea*, 3 Ex. 413 ; *Corp. of Hastings* v. *Ivall*, 13 Moak's Eng. Rep. 526.) The rule that public grants should be construed strictly as against the grantee the defendants cannot invoke, for it applies as between the immediate parties, not to those claiming under them. (*Coleman* v. *Beach*, 97 N. Y. 545.) Plaintiff's title to the franchises is good. (*Mayor, etc.,* v. *N. Y. & S. I. Ferry Co.,* 40 Supr. Ct. 232 ; *Mayor, etc.,* v. *Ft. Lee Park, etc.,* 64 How. 30 ; *Coster* v. *Brush,* 25 Wend. 627 ; *Mayor, etc.,* v. *N. Y. & N. E. Transfer Co.,* 14 Blatch. 159.) It is not material in what capacity the plaintiff took its title to the franchise in its public character and as one of the agencies of the sovereign power, or in its other capacity being in respect to proprietary rights and interests, as between itself and the State, that of a private and not a public corporation. (*Aiken* v. *West. R. R. Corp.* 20 N. Y. 370 ; *Minturn* v. *Larone,* 23 How. [U. S.] 435 ; *Benson* v. *Mayor, etc.,* 10 Barb. 223, 234 ; 2 Kent's Com. 275 ; *Bailey* v. *Mayor, etc.,* 3 Hill, 531, 540 ; *People* v. *Mayor, etc.,* 32 Barb. 112.) The possession of a United States license under the navigation laws has nothing to do with the question. (*Conway* v. *Taylor,* 1 *Black,* 603 ; *Starin* v. *New York,* 115 U. S. 248.)

*James McNamee* and *Adolph L. Pincoffs* for John H. Starin, and others, respondents. When the president, treasurer or directors of a corporation are made parties to a suit to enjoin certain action taken by the corporation, the rule is to consider their joinder as purely nominal. (*Pond* v. *Sibley,* 7 Fed. Rep., 129 ; *Hatch* v. *Chicago, R. I. & P. R. R. Co.,* 6 Blatch. 114 ; *Grover* v. *Swain,* 29 Hun, 454.) It was not within the power of the crown to grant as a private property right the exclusive right to ferry between two islands generally without any corresponding obligation to establish ferries, or to delegate irrevocably the right to control navigation. (*Newton* v. *Cubitt,* 12 C. B. [N. S.] 32 ; 13 C. B. [N. S.] 564 ; *Hopkins* v. *Gt. N.*

*Riv. Co.*, L. R., 21 Q. B. D. 223; *Smith* v. *City of Roch.*, 92 N. Y. 463.) A grant of the right to establish ferries between two islands generally without pointing out particular landing places, cannot be considered as conferring any private property right, or to be a grant of " a ferry." Such a construction would be repugnant to the nature of a ferry. (*Newton* v. *Cubitt*, 12 C. B. [N. S.] 32; 13 C. B. [N. S.] 864; *Matthews* v. *Peache*, 5 E. & B. 546; *Price* v. *Knott*, 8 Ore. 443.) If the grant in the Montgomerie charter was merely of a public right, the State had the right to revoke it, and it has exercised this right as far as ferries to Staten Island are concerned, even if they were originally embraced within such grant. (Laws of 1845, chap. 363; Laws of 1848, chap. 257, *Benson* v. *Mayor, etc.*, 10 Barb. 223; *People* v. *Mayor, etc.*, 32 id. 102; *Mayor, etc.* v. *N. Y. & S. I. Ferry Co.*, 40 Supr. Ct. 241, 248; *Darlington* v. *Mayor, etc.*, 31 N. Y. 164.) If the grant in the Montgomerie charter be considered as conferring any private property rights to ferries it must be strictly construed, as such rights are in the nature of a monopoly. (*C. R. Bridge* v. *Warren Bridge*, 11 Pet. 545; *Auburn & C. P. R.* v. *Douglas*, 9 N. Y. 444; *Letton* v. *Goode*, 14 L. T. [N. S.] 298.) Cotemporaneous construction of the Montgomerie charter as to the ferry rights of the city, and acts in *pari materia* by provincial and city authorities are admissible to show the true nature and extent of such rights as contemporaneous evidence and as admissions against interest. (*People* v. *Dayton*, 55 N. Y. 375; *Canajos* v. *Trevino*, 6 Wall. 785; *Smith* v. *People*, 47 N. Y. 339; *Power* v. *Vil. of Athens*, 99 id. 601; *People* v. *Mauran*, 5 Dem. 389, 396; *Knapp* v. *Warner*, 57 N. Y. 668; *Mayor* v. *Hart*, 95 id. 451.) The result of the relief sought by the plaintiff, viz., of a decree permanent by enjoining the defendants from conducting, without license from the plaintiffs, the transportation business between New York and Staten Island in the mode in which it has been conducted would be to hamper inter-state commerce, in violation of the provisions of the Constitution and laws of the United States. (*Gloucester Ferry Co.* v. *Penn.*,

114 U. S. 203; " *The Daniel Ball*," 10 Wall. 557.) The
defendants are not engaged in running a ferry, but in the
ordinary business of transportation and in the coasting trade.
(*Steamboat Co.* v. *Livingston*, 3 Cow. 754; " *Hazel Kirk*," 25
Fed. Rep. 708.) If a State franchise only is being violated,
the State authorities in civil or penal actions can alone prose-
cute the offender. (*C. R. Bridge* v. *Warren Bridge*, 11 Pet.
623; General Ferry Act of March, 1779, 1 Webster, 163;
2 R. L. [1813] 210.)

EARL, J. This action was commenced to restrain the defend-
ants from maintaining and operating a ferry between the city
of New York and Staten Island.

The plaintiffs allege in their complaint that under what is
called the Montgomerie charter, the city of New York has
the exclusive ownership of the ferry franchise between it and
Staten Island, and the exclusive right to establish and regulate
the ferries, with power to let, sell or otherwise dispose of
them; that in violation of its rights, the defendants were
operating a ferry between New York and Staten Island,
and that they thus intercepted and unlawfully appro-
priated profits, rents and ferriage fees which belonged to it;
that before the commencement of the action it had duly estab-
lished a ferry between it and Staten Island, which it had
leased to the Staten Island Rapid Transit Railroad Company
for a term of years, expiring on the 1st day of May, 1893, and
that under and in consideration of such lease, it received from
the Railroad Company an annual rent of $10,000 for wharf
privileges, together with fourteen and one-quarter per centum
of the gross receipts of the ferry franchise; that by reason of
the unlawful operation of the ferry by the defendants, the
revenues and profits of the ferry established and leased by it
were seriously diminished, and that unless the defendants were
restrained from their unlawful operation of the ferry, it would
suffer great damage and injury; and the plaintiffs prayed
judgment that the defendants and each and every of them,
and their agents and servants, be restrained by the order and

injunction of the court from operating a ferry between the city and Staten Island, and that an account might be taken of the damages suffered by the city by reason of the unlawful operation of the ferry by the defendants.

Besides other matters and defenses alleged in their several answers, the defendants put in issue the claim of the city of the exclusive ownership of the ferry franchise between it and Staten Island, and its exclusive right to lease the ferries, and denied that they were operating any ferry, and alleged that they were engaged in the transportation of goods, merchandise and passengers upon the public waters between Staten Island and New York with steamboats, duly enrolled and licensed under the laws of the United States for carrying on a coasting trade.

The issues thus framed were brought to trial at a Special Term of the Supreme Court, which decided the case in favor of the plaintiffs as against the Independent Steamboat Company, and dismissed the complaint as to the other defendants. A judgment was entered against the Independent Steamboat Company perpetually restraining it from operating any ferry between the city and Staten Island, and adjudging that it should pay to the city for the damages caused to it for its unlawful acts, the sum of $338.73, besides the costs of the action. From the judgment entered upon the decision of the Special Term against it, the Independent Steamboat Company appealed to the General Term, and the plaintiffs appealed from so much of the judgment as was adverse to them.

In the consideration of this case, it is important first to determine what a ferry is. In a general sense it is a highway over narrow waters. In 2 Washburn on Real Property (3d ed.) 269 it is said: "Ferries, that is, rights of carrying passengers across streams, or bodies of water or arms of the sea, from one point to another, for a compensation paid by way of a toll, are, by common law, deemed to be franchises, and cannot in England be set up without the king's license, and in this country without a grant of the legislature as representing the sovereign power, and do not belong to the riparian proprietors

of the soil." A ferry franchise is property, an incorporeal hereditament, and as sacred as other property. (*Conway* v. *Taylor's Ex'rs*, 1 Black. 603). And the right to a ferry does not depend upon the right to, or the property in the waters over which it passes, or in the soil under the water, or upon the shore at either end of the ferry. (*Fay, Petitioner, etc.*, 15 Pick. 243, 253.) A ferry is a continuation of the highway from one side of the water over which it passes to the other, and is for the transportation of passengers, or of travelers with their teams and vehicles and such other property as they may carry or have with them. (*Broodnox* v. *Baker*, 94 N. C. 675.) In a strictly ferry business, property is always transported only with the owner or custodian thereof; and ferrymen who do nothing but a ferry business, and have nothing but a ferry franchise are bound to transport no other property; and in the transportation of persons with their property, they are not under the obligations of a common carrier, but are bound only to due care and diligence. (*Wyckoff* v. *Queens County Ferry Co.*, 52 N. Y. 32.) But they may combine, and usually do combine, with the ferry business, the business of a common carrier, carrying freight and merchandise without the presence of the owner or custodian like other carriers engaged in the transportation of such freight; and as to such freight, they are under the duties and obligations of a common carrier. As ferrymen, they are under a public duty to transport with suitable care and diligence all persons with or without their vehicles and other property; and as common carriers, it is their duty to carry all freight and merchandise delivered to them.

No one has the right to set up a public ferry and charge tolls for the transportation of persons and property without the license of the sovereign. And at common law, it is believed, that one so doing was guilty of a crime, and he could be proceeded against by writ of *quo warranto ;* and so by our Penal Code, it is enacted that "a person who maintains a ferry for profit or hire upon any waters within this State without authority of law, is punishable by a fine not exceeding $25 for

each time of crossing or running such ferry." (§ 416.) And any person who invades the franchise of another by running a ferry is liable for any damage he causes such other person, and may be restrained by the judgment of a competent court. The owner of a ferry franchise is bound to exercise his franchise for the public convenience, and if he fails to do so, his franchise may be forfeited by the soverign for nonuser, and at common law he could be indicted. If he fails to establish and maintain a ferry, he could not in a civil action restrain any other person from operating the ferry, or recover any but nominal damages for his so doing. No court would restrain the operation of a ferry which was demanded by the public convenience, simply because the franchise belonged to another who neglected or refused to use it. So, also, if the owner of an exclusive ferry franchise does not establish sufficient accommodations for the public, he may be proceeded against by the sovereign and compelled to discharge his public duties, or his franchise may be forfeited.

It is therefore undisputed that if the plaintiffs have the ferry franchise which they claim, and the defendant, the Independent Steamboat Company, had established and was engaged in operating a ferry between New York and Staten Island, then this judgment was right and ought to be affirmed.

Manhattan Island, afterward the city of New York, is an island, formed by the Hudson River on the one side, and Spuyten Duyvel Creek, and the Harlem and East Rivers on the other sides ; and Staten Island is in the waters south of New York, the nearest point of which is about five miles therefrom. It is about fourteen miles in length, eight miles in width at its widest point, and contains about fifty square miles.

The first charter of the city of New York was granted by Governor Nicolls on the 12th of June, 1665, but it contained nothing on the subject of ferries. On the 27th of April, 1686, Thomas Dongan, Lieutenant-Governor of New York, under King James the Second, gave to the city of New York what is known as the Dongan charter, granting a ferry which had

before been established, now known as Fulton Ferry, from
New York city to Long Island, defining the boundaries and
jurisdiction of the city and granting full power " to establish,
appoint, order and direct the establishing, making, laying out,
ordering, amending and repairing of all streets, lanes, alleys,
highways, water-courses, ferries and bridges in and throughout
the said city of New York and Manhattan's Island." On the 23d
of January, 1708, Cornelius Seberingh, of Nassau, now Long
Island, presented to Viscount Cornbury, Governor of the
Provinces of New York and New Jersey, a petition indorsed
by many citizens, for letters-patent for another ferry between
the city and Nassau Island, to the south of Fulton Ferry. On
the 5th of February, 1708, the mayor, aldermen and com-
monalty of the city of New York presented their petition to
Governor Cornbury, protesting against the grant of any
ferry as prayed for by Seberingh, on the ground that the ferry
between the city and Nassau Island had been theretofore
granted to them by the Crown, and was now their property,
and that to grant the petition of Seberingh would destroy their
ancient ferry and remove the chief income and support of the
corporation. This petition led to the refusal of Seberingh's
request, and a petition of the city, presented April 8, 1708,
effected the granting of what is known as the Cornbury charter,
dated April 19, 1708. That charter was asked for and granted
upon the theory previously expressed in a petition by the
mayor, aldermen and commonalty to Governor Cornbury in
1702, that the Dongan charter gave only one ferry, which
extended beyond the limits and jurisdiction of the city, viz. :
the one now called Fulton Ferry ; and the Cornbury charter,
therefore, extended that grant so as to include the land under
water to high-water mark on the Nassau Island side as
far south as Red Hook, and the right to establish other ferries
between the shores of Manhattan and Nassau Islands as far
south as that point. On the 6th of November, 1712, the
petition of John Dove and John Bellue, of Richmond county,
which embraced Staten Island, to Robert Hunter, governor
of the provinces of New York and New Jersey, praying for

a license to the end that they might not be molested in operating their ferry from Sand Bay on the easternmost part of Richmond county to New York city, Long Island, and other adjacent places, was read in the governor's council. It is apparent that the ferry was already in operation. On April 2, 1713, Governor Hunter directed the preparation of letters patent to the petitioners for a ferry as prayed for, between Staten Island and New York city, and Staten Island and Long Island, for a term of twenty years; and on that day such letters-patent, with the right to receive ferriage fees, were accordingly granted to Dove and Belluc. In 1730, the mayor, aldermen and commonalty of the city of New York petitioned John Montgomerie, governor of the provinces of New York and New Jersey, for a new charter confirming and adding to their rights and privileges. In their petition they represented that the city "had grown large and populous and had a fair prospect of a numerous accession of inhabitants." And among other things they prayed that "the corporation aforesaid may have the sole power and authority of appointing ferries around this island, with the profits, benefits and advantages arising therefrom, with such fees as shall be regulated by act of assembly." Thereafter, the governor's council agreed that the petition, as presented, should be granted, with some modifications. The petition as to the ferries was agreed to except that the fees of ferriage should be such as should be appointed by the governor and council, or by act of assembly. Thereupon, Governor Montgomerie directed his majesty's attorney-general for the province of New York to prepare a patent for a charter to the city pursuant to the petition, and the report of the council thereon made and allowed and approved by the governor. Thereafter, in the same year, the letters patent, called the Montgomerie charter, were executed under the great seal of the province of New York and delivered to the city of New York. That charter, among other things, contained in section 15 the following provision: "And we do further, for us, our heirs and successors, give, grant and confirm unto the mayor, aldermen and commonalty of the said city of

New York, and their successors forever, that the common council
of the said city, for the time being, or the major part of them (but
no other person or persons whomsoever, without the consent,
grant or license of the said common council of the said city,
for the time being, or the major part of them), from time to
time, and at all times hereafter, shall and may have the sole,
full and whole power and authority of settling, appointing,
establishing, ordering and directing, and shall and may settle,
appoint, establish, order and direct such and so many ferries
around Manhattan's Island, alias New York Island, for the
carrying and transporting people, horses, cattle, goods and
chattels from the said Island of Manhattan's to Nassau Island,
and from thence back to Manhattan's ; and also from the said
Island Manhattan's to any of the opposite shores all around
the same island, in such and so many places as the said com-
mon council, or the major part of them shall think fit, who
have hereby, likewise, full power to let, set or otherwise dis-
pose of, all or any of such ferries, to any person or persons
whomsoever ; and the rents, issues, profits, ferriages, fees and
other advantages arising and accruing from all and every such
ferries, we do hereby fully and freely for us, our heirs and
successors, give and grant unto the mayor, aldermen, and
commonalty of the city of New York, aforesaid, and their
successors forever, to have, take, hold and enjoy the same to
their own use, without being accountable to us, our heirs or
successors, for the same or any part thereof."

The sovereign was competent to grant and the city to receive
these ferry franchises.  Such a franchise is property, and the
sovereign power is just as able to make an irrevocable grant of
it as of any other property.  If it can grant a ferry franchise
for a term of years, it can do so forever.  By so doing it does
not part with any political or governmental function.  It still
may regulate the conduct of the ferry for the public good
and control the tolls to be charged ; and it can resume the
proprietary right in the franchise only by exercising the right
of eminent domain or by forfeiture enforced through regular
judicial proceedings.  By this grant the city did not merely

receive the political right to establish and regulate ferries, but it received the property in the ferry franchises as it received the other property granted to it by its various charters; and we do not find any evidence in the record that what it so received it has ever lost or been deprived of.

The principal point to be determined in this case is the meaning of the words contained in the fifteenth section, "the opposite shores all around the same island," the contention of the defendants being that the shores of Staten Island are not opposite shores within the meaning of the grant.

At the date of the Montgomerie charter Staten Island contained about 1,800 inhabitants, and the city of New York about 8,000. New York was then a growing and enterprising city with a brilliant future before it, and there was no other organized community of any considerable importance in its vicinity. It was an island, to be reached only by crossing the waters which surrounded it. The ferry which it already owned to Long Island yielded a large share of the revenue needed for the expenses of the city government. There had been other applications by individuals for ferry franchises, which might and probably would interfere with the revenues which the city was then receiving, and which might divert revenues which were needed by the city or might come to it for its municipal expenses if it owned and could control all the ferry franchises around the city. There was just as much reason for bestowing upon the city all the ferry franchises around it as the ferry franchises to Long Island. There was no reason whatever, while conferring upon it all the other ferry franchises, for excepting those between it and Staten Island. A ferry was already in existence between it and that island, and hence the ferry franchises between it and that island could not have escaped the attention of those who asked for and who made the grant. In its petition the corporation prayed for the exclusive ferry franchises "around the island." The minutes of the governor's council show that the language of the petition was carefully scrutinized, and they recommended that the exclusive ferry

franchises "around the island," without any limitation or qualification, should be granted. The governor approved the action of his council and ordered the attorney-general to prepare a grant in pursuance thereof. There is no indication whatever that he intended to make any change in what the council had thus agreed to and recommended, and the inference is that the attorney-general, having no independent authority of his own to vary or limit the terms of the proposed grant, meant to embody in the grant or charter what the governor and council had agreed to. He was ordered to prepare a charter, giving to the city the exclusive ferry franchises "all around the island," and we must suppose he intended to obey that order, and that the language which he used was intended to embrace the ferry franchises all around the city. The language used indicates a plain intention to grant such ferry franchises, and the words "opposite shores" may have been inserted because under the Dongan charter the city had the right "to establish ferries and bridges in and throughout the said city of New York and Manhattens Island," and the words "opposite shores" may have been inserted to distinguish the ferries granted under the Montgomerie charter from those previously granted under the Dongan charter. The language as to the ferries in the Dongan charter was not without meaning, as there was at that time upon Manhattan Island a body of water two miles in circumference and fifty feet deep, having its outlet in the Hudson river, covering land where the commerce of a continent now ebbs and flows. But ferries, in a broad and general sense, always run across narrow waters between opposite shores. A highway comes to the water on one side and crosses by a ferry to the other side, which, according to the common and ordinary use of language, may be called the opposite side. Thus from whatever point a ferry could be operated to or from the city, it would be from one side of the water to the opposite shore on the other side. The persons who were concerned with this grant of ferry franchises

did not intend to limit the right of the city to ferries from some point in the city to a point diametrically opposite. They were concerned with a grant for all time, and the plain purpose was to secure to the city all the ferry franchises to and from it.

Our construction of the fifteenth section of the charter as to ferries is made still clearer by a reference to the language of section 37. That is the section in which property rights are expressly granted to the city. It grants the City Hall and jail, market-houses, the great dock, crane, wharf, sewer, powder-house, " and the ferry and ferries on both sides of the East river, and all the ferries now and hereafter to be established all around the island of Manhatten's, and the management and rule of and all fees, ferriages and perquisites to the same or any part thereof belonging or to belong; and also the ferry-house on Nassau Island, with the barns, stables, pens or pounds, and lot of ground thereto belonging, and also all the grounds, soil and land between high water and low water mark on the said island of Nassau from the east side of the place called Wallaboute to the west side of Red Hook, and also to make laws and rules for the governing and well ordering of all the ferries now erected or established, or hereafter to be erected or established around the said island of Manhatten's." Whatever doubt there might be as to the meaning of section 15 read alone, is removed when its language is considered in connection with the language of section 37, in which there is no limitation of ferry franchises to opposite shores, but in which such franchises are granted all around the island.

We are, therefore, of opinion that it is reasonably certain, taking into consideration the topographical situation of the city, all the circumstances attending the grant, the language used in the various documents, the two sections of the charter, and the purpose apparently sought to be accomplished, that the intention was that the city should have the exclusive ferry franchises all around the city, including the ferry franchises between it and Staten Island.

We do not fail to recognize the rule of the common law which requires that all gratuitous grants by the sovereign of exclusive privileges and franchises should be strictly construed, and that any ambiguity in such grants must operate against the grantee and in favor of the sovereign or the public. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 129 ; *Mayor, etc.*, v. *Broadway, etc., R. R. Co.*, 97 N. Y. 275.) But this common law rule, in its strictness, is not fully applicable to the grant of a ferry franchise, because that is never without consideration, for it imposes upon the grantee the obligation to maintain a ferry with suitable accommodations for the convenience of the public (*Hussey* v. *Field*, Gale, 164 ; *Letton* v. *Good*, 14 Law Times Rep. [N. S.], 298) ; and for the further reason that the charter itself enjoins that it shall in all things "be construed, taken and expounded most benignly and in favor of and for the most and greatest advantage, profit and benefit of the said mayor, commonalty and the city of New York." The question is, what did the sovereign which owned these franchises and had the right to grant them mean by the language used ? And so far as there is any ambiguity in that language, the injunction of the sovereign is that it shall be construed most benignly and favorably to the city.

But while there is scarcely a doubt as to the meaning of the language used, yet that meaning is not so absolutely certain that there is not room for construction. The defendants, therefore, claim that to ascertain the meaning of the language, and the extent and operation of the grant, resort may be had to the practical interpretation given to the grant by the subsequent acts and conduct of the parties in reference thereto. (*People* v. *Mauran*, 5 Denio, 389 ; *Goodyer* v. *Carry*, 4 Blatch. 271 ; *Smith* v. *People*, 47 N. Y. 330, 339 ; *Easton* v. *Pickersgill*, 55 id. 315 ; *Knapp* v. *Warner*, 57 id. 668 ; *Powers* v. *Village of Athens*, 99 id. 592, 601 ; *Duke of Beaufort* v. *Corporation of Swansey*, 3 Exch. 413 ; *Hastings* v. *Ivall*, L. R. 19 Eq. 598 ; *Canajor* v. *Trebind*, 6 Wall. 785 ; *Drummond* v. *Att'y-Gen'l*, 2 H. of L. 681 ; *Mayor, etc.*, v. *Hart*, 95 N. Y. 443, 451.) If the practical construction of the charter by

the parties interested, as evidenced by their acts, as to the ferry franchises granted thereby, had been uniform, it would have been entitled to gréat, if not controlling weight.   But if that construction has not been uniform, and if the acts of the parties interested indicate conflicting views and speak an uncertain language and thus simply raise doubts, then they furnish no aid whatever, and throw no light upon our researches into the meaning of the provisions of the charter.   It is to be noticed, in the first place, that no one ever expressly disputed the exclusive right of the city to these ferry franchises prior to 1878, when the defendant Starin first disputed it.   The fact that the city, at any time, asserted its exclusive right to these ferry franchises is of far greater significance than the fact that on one or many occasions it failed to assert or enforce its right. The city might, on many occasions, from favoritism, corruption or inattention on the part of its officers, or because the ferry franchises were not sufficiently valuable to receive attention, omit to assert and enforce its rights.   But omission to assert its rights, or passive submission to the invasion thereof, can have but little bearing in the construction of this grant.   When, however, the city, from time to time, asserted and exercised its right, claiming the exclusive franchise, such acts show beyond question how the city understood its rights under the charter.

One or more ferries between New York and Staten Island were in operation at the date of the Montgomerie charter. On the 24th of November, 1747, one De Hart, of Staten Island, presented a petition, not to the city, but to the governor of the colony of New York under the crown, stating that he had been actually engaged in conducting a ferry from Staten Island to New York, and that other residents of Staten Island had threatened to set up other ferries to the injury of his ferry and praying his majesty's letters-patent to erect his ferry into a public ferry, and also a grant of certain vacant and unpatented land between high and low-water mark.   At that time Chief Justice De Lancy, who is supposed to have been chiefly instrumental in procuring for the city the

Montgomerie charter, and Edward Holland, the mayor of the city, were members of the governor's council. A petition and *caveat* in opposition to the petition of De Hart by owners of property on Staten Island and by persons who had been used to carry travelers from that island to the city, were presented to the governor. On the 7th of December, 1748, one Soloman Comes, who had purchased De Hart's farm and water front, and who had kept up the transportation business between that point and the city, renewed De Hart's petition to the governor, asking, however, not only the ferry franchise but also the land between high and low-water mark for one mile on each side of his water front. The petitioner and the parties opposed were heard by counsel on several different days before the governor's council, and after a full hearing the council advised the governor to grant the petition; and on the 14th of August, 1749, his majesty's letters-patent for the ferry thus recommended were granted to Comes. They granted to him the soil between high and low water mark as prayed for, and the exclusive franchise of a ferry between his land and the land for one mile westward thereof and the city for " twenty-one years and from the expiration of said term until letters-patent should be obtained for the establishing or keeping of a ferry or ferries within the mile or limits aforesaid."

It is undoubtedly a very significant fact, of which no satisfactory explanation can be given, that this petition should have been presented to the governor and not to the city, and that these letters-patent should have been granted by the governor, representing the crown, and that the rights of the city to these franchises under the Montgomerie charter should thus have been entirely ignored. As the mayor of the city was a member of the governor's council, this petition and the action thereon must have been fully known to the city, and yet no protest seems to have been made by the city against it. But the city up to that time had not yet established any ferry between New York and Staten Island, and it may have been supposed that until the city chose to exercise its franchise the concurrent

power in reference thereto remained in the Crown. At that time the franchise could probably not be made a source of profit to the city, and it may have been supposed that it never could be made a source of revenue, and therefore it may be that the city did not deem it important to intervene or protest. But one of the main features of the petition and the letters-patent was the title to the land between high and low-water mark. That was deemed, evidently, one of the essential incidents to the ferry franchise prayed for, and the city was powerless to grant that, and that may furnish the reason why the petition was presented to the governor instead of the city. But whatever the reason was for the action of the governor and his council in granting these letters-patent, it does not appear that in the proceedings resulting in the patent any one questioned or disputed the right of the city under the Montgomerie charter. It does not appear that any ferry was set up or run by Comes under his patent, nor what became of the ferry franchise thus granted to him ; and it is not claimed that it is now in existence in the ownership of any one. It is difficult at this late day, after the lapse of nearly 140 years, to determine precisely what significance the granting of these letters-patent to Comes should have. If there were nothing more, and particularly if the other acts of the sovereign power and the city were in harmony with this, the defendants would have much reason for the construction of the Montgomerie charter for which they contend. But five years and one-half after the granting of the letters-patent to Comes, on January 16, 1755, at a meeting of the common council of the city of New York, presided over by the mayor, Edward Holland, who was a member of the governor's council at the time of the granting of the letters-patent to Comes, a committee was appointed " to enquire into the properest method for the erecting and establishing of a ferry to and from this city to Staten Island and any other place." On the seventh of March thereafter, at a meeting of the common council, the committee thus appointed unanimously reported " that it is their opinion the best and properest method to let and to establish said ferry is

to treat with those persons living on Staten Island who have
a grant from the crown to ferry from said island to this city,
or any other persons who incline to farm said ferry." The
report was read and approved by the common council, and the
same persons were appointed "a committee to treat with
proper persons for the letting of the ferry to be erected and
established to and from this city to Staten Island or any other
place for a term of years, not exceeding five, and make report
thereof to this board with all convenient speed." This action
of the common council is very significant. It shows that the
members thereof, including Mayor Holland, understood that
the city possessed the right to farm and let the ferries between
New York and Staten Island; and they clearly did not sup-
pose that they were invading the prerogatives of their sovereign
in assuming to establish and control such ferries. As the city
did not own any landing place on Staten Island, it was doubt-
less deemed best to treat with persons living there who had
landing places, and who but a short time before had received
the ferry grant from the crown. The intention evidently was
to give any persons who were then operating the ferry the
preference; but if such persons refused to deal with the city
then the intention was to farm the ferry to any persons
who were inclined to take it. Here was a very significant
assertion on the part of the city of its ownership and
right to control the ferry franchises between the city and
Staten Island. The records of the common council do not
show any subsequent report of the final committee appointed
to treat for the letting of the ferry or that the action of the
common council resulted in the establishing of any ferry.
There is no evidence that any action was thereafter taken by the
common council until March, 1785, when the ferries from the
city to Staten Island were put up for sale at vendue, and sold
for the term of three years for twenty pounds per year.
From 1823 to 1831, the city had a tenant who ran a ferry
from the city to the north shore of Staten Island eight years.
From 1827 to the commencement of this action, it had tenants
who had been running a ferry from the east shore of Staten

Island fifty-seven years; and from 1877 to the commencement of this action it had tenants who ran a ferry which it established in 1875 to the north shore of Staten Island seven years. It is undoubtedly true that from 1730 to 1875, unauthorized ferries were from time to time run between the city and Staten Island. But during most of the time the population of Staten Island was so small, and the traffic and intercourse between it and New York so unimportant that the city could not derive any revenue by assuming control of the ferries. The public convenience was served if ferries were maintained and operated by any one. During a large portion of the time the city received some revenue, which may have been deemed satisfactory, from the rental of slips and wharves to persons who were operating the ferries. But during all this time, with the single exception of the grant to Comes, the sovereign authority never assumed to control or interfere with the ferry franchises between the city and Staten Island, and no one but the city assumed the right to establish ferries and let them. At all times after 1730, whenever the city saw fit to assume control over the ferries to Staten Island, or to establish them, or to create revenue by leasing them, it asserted its authority over them without any question or denial of its right from any quarter.

There is nothing, therefore, in the contemporaneous or subsequent treatment of these ferries by the city or in the practical construction of the grant contained in the Montgomerie charter, as evidenced by the acts of the city, or of the sovereign, which in any way limits the fair import of the language contained in the grant. The subsequent history of these ferries to which we have referred shows quite plainly that the city has at all times claimed the ferry franchises between it and Staten Island, but has not at all times seen fit to assert its claim. An appeal to such history, therefore, in no way sustains the contention of the defendants.

Our attention has been called to several acts of the legislature which are supposed to impugn the exclusive right of the city to the ferry franchises between it and Staten Island; and they are chapter 182 of the Laws of 1839; chapter 363

of the Laws of 1845 ; chapter 257 of the Laws of 1848. These acts were all similar, and their simple purpose was to create corporations to operate ferries between the city and Staten Island. But they gave no right to the corporations thus organized to interfere with the franchises of the city, or with the property of the littoral owners on Staten Island. Before the corporations thus formed could operate their ferries, they were just as much bound to acquire the right from the city as owner of the ferry franchises to operate the ferries as they were bound to acquire property for landing places at both ends of the ferry.

It may be that the legislature did not have in mind the rights of the city when these acts were passed, else they would have expressly saved such rights, as they did in the acts, chapter 315, Laws of 1849; chapter 680, Laws of 1873, and chapter 193, Laws of 1884. But it cannot be assumed that the legislature intended, by the acts of incorporation referred to, to unlawfully confiscate or interfere with the property rights of the city.

Our conclusion, therefore, is, that the city had the exclusive ownership of the ferry franchises between it and Staten Island and the right to establish, control and receive the revenues of all the ferries between the two places.

A further point is made on behalf of the defendants that the city had not lawfully established a ferry to Staten Island, and that it had not executed a legal lease of any ferry to the Staten Island Rapid Transit Railroad Company. The resolution establishing the ferry and the lease are assailed upon various grounds which it is not important particularly to notice. It is sufficient that the city owned all the ferry franchises to Staten Island, and that it was engaged in operating a ferry between it and several places on the shores of that island under a contract which gave it a share of the profits of the business. The defendants were wrong-doers, having no right whatever to operate a ferry between the same points on Staten Island and the city, and they are not in a position to assail the resolution or the lease or the arrangement between the city and

the railroad company. If the resolution or lease is illegal or invalid, the question of the validity of the one or the other may be raised by the lessor or the lessee, or possibly by the suit of a taxpayer, or the attorney-general in the name of the people against the proper parties. But a mere wrong-doer, having no rights whatever, cannot appropriate the franchises of the city because it has not, in the mangement of them, observed the provisions of its charter. It is sufficient as against these defendants that ferries were in fact established and operated and thus that the duties of the city as owner of the franchises to the public were discharged.

If the city had failed to establish or cause to be operated any ferry for the public accommodation from any of the places between which and the city of New York the Independent Steamboat Company was operating its ferry, we would have had a different question to deal with. But no complaint is made that the ferry service between Staten Island and the city is not adequately performed under the city for the public convenience.

It cannot reasonably be questioned that the Independent Steamboat Company was operating a ferry between the city and Staten Island. It was engaged at regular times, with boats adapted to the purpose, in transporting, in consideration of tolls paid, travelers, with and without their personal property, over the waters between the city and that island. So far it was engaged in the ferry business, and its coasting license gave it no authority to invade the ferry franchises of the city. But it also carried on the business of a common carrier of freight between the city and the island, and that business it could do without any wrong to the city. The judgment, therefore, against the steamboat company is too broad, as it restrains the company from transporting any property between the city and Staten Island, whether such property be transported merely as freight or with the owner or custodian who accompanies the same.

The judgment of the court below dismissing the complaint as to all the defendants but the steamboat company should

not be disturbed.  Those of the defendants who merely chartered boats to the steamboat company, to be used in its business, did not violate the rights of the plaintiff and were in no sense proper parties to the action.  The other defendants, who were mere agents and servants of the steamboat company, were not necessary parties, because they could be restrained by any injunction issued against the principal and master. (*Pond* v. *Sifley*, 7 Fed. R. 129; *Davis* v. *The Mayor of New York*, 1 Duer, 451; High on Injunctions, §§ 1435, 1438, 1440.)  While the agents and servants in such a case may be joined as defendants, they need not necessarily be joined, and as the court below has not deemed their presence in this action as parties defendant necessary or important, we have no occasion to interfere with its determination in that respect.

In the very able and laborious briefs submitted to us, and in the arguments of the learned counsel, many views were expressed which we are not able to notice particularly without exceeding the reasonable limits of a judicial opinion.  We have given them careful attention and think we have written enough to justify the conclusion which we have reached.

The judgment of the General Term should, upon the appeal of the Independent Steamboat Company, be modified as to the restraint imposed upon that company, so as to restrain it only from maintaining and operating any ferry between the city and Staten Island; and, as so modified, the judgment should be affirmed, without costs to either party upon that appeal.  Upon the appeal of the plaintiffs from so much of the judgment as dismissed the complaint, the judgment should be affirmed, with one bill of costs to the respondents.

All concur.

Judgment accordingly.