### NEW YORK CENT. & H. R. R. CO. v. SHEELEY et al.

(Supreme Court, Special Term, Albany County.   December 6, 1893.)

1. RAILROAD COMPANIES—RIGHT TO USE GROUNDS—HACKMEN.
   Laws 1890, c. 565, § 34, providing that a railroad company shall give no preference for the transaction of the business of a common carrier on its cars or in its depots or on its grounds to any persons competing in the same business, or in the business of transporting property for themselves or others, does not require railroad companies to allow all hack drivers alike to use its grounds as a standing place to solicit business at its depot, as a hackman is not a "common carrier,' within the meaning of the statute.

2. SAME—RULE AT COMMON LAW.
   At common law a railroad company is under no obligation as a common carrier to afford accommodation to hackmen for a transaction of their business of carrying passengers to and from the depots of the company.

3. SAME—REASONABLE COMPENSATION.
   Where a railroad company offers to allow all the hackmen the same privileges and facilities in its depot on their paying the company a certain compensation, the court will not inquire into the reasonableness of such compensation.

Action by the New York Central & Hudson River Railroad Company against William Sheeley and others.   Defendants move to dissolve an injunction restraining them from entering on plaintiff's station grounds at the city of Niagara Falls.   Denied.

Harris & Harris, for plaintiff.
King & Morgan, for defendants.

GREEN, J.   This action was brought to restrain the defendants from entering upon the plaintiff's station grounds at the city of Niagara Falls.   The complaint and affidavits upon which the injunction herein was granted, and the papers used on this motion, if true, establish a right to the relief prayed for.   The plaintiff is a railroad corporation and the defendants are hackmen.   The plain-

tiff has offered, and still offers, to admit the defendants to the privileges of its station grounds at Niagara Falls upon their complying with the terms and conditions exacted by the plaintiff. The defendants have not offered to comply with these conditions, claiming that they are unreasonable, and that they have a right to enter upon said grounds, and carry on their business thereon, notwithstanding the plaintiff's protest, by virtue of the provisions of section 34 of the railroad law. Upon the complaint and affidavits showing these facts an injunction was granted pending the action, restraining the defendants from the acts complained of. This motion is to dissolve that injunction.

The injunction was properly granted. The complaint and affidavits upon which the injunction was granted, if true, establish a right to the relief prayed for. Where the injury resulting or likely to result is irreparable in its nature, either in respect of being compensated pecuniarily, or because from the circumstances no estimate of the damages can be made with reasonable accuracy, the inadequacy of legal remedies is sufficiently apparent. A temporary injunction will be granted in the first instance pending an adjudication of the legal rights, though the same be in dispute. 1 Spell. Extr. Relief, § 336. The irreparable damages here meant usually result from repeated wrongs of a continuing character, resulting in damages which cannot be estimated by any accurate standard, and can only be conjectured. Against such wrongs as these, courts of equity rarely refuse to grant relief by injunction. Courts of equity do not ordinarily restrain the commission of a mere trespass. There must be some great vexation from continued trespass, or some irreparable mischief which cannot easily be measured by damages. Id. § 340. Where numerous acts are being committed, and their continuance threatened, by one person on the land of another, (and, a fortiori, by many persons,) which acts constitute trespass, and the injury resulting from each is or would be trifling in amount, as compared with the expense of prosecuting actions at law to recover damages therefor, injunction will lie to restrain the trespass, not alone because of the irreparable nature of the general course of wrong, nor yet for the reason that a multiplicity of suits or protracted litigation would result, but for both reasons; in other words, because a law court furnishes no adequate means for a complete redress, while in equity not only may the whole matter of compensation be settled, but the present and future rights of the parties determined and adjudicated, in the same proceeding. Id. § 342. But, whatever be the true reason for interfering, the inadequacy of the legal remedy must be shown to warrant relief by injunction, which is equivalent to saying that from the nature of the injury, or from the fact that its continuance or frequent repetition is threatened, it is irreparable at law. Id. § 343. It is the general principle that the legal remedy which warrants a refusal of relief by injunction must be plain and adequate; in other words, as practical and efficient for attaining the ends of justice and its prompt administration as that in equity. The test of equitable jurisdiction in the application of this principle to a particular case

usually depends on the character of the case as disclosed in the proceedings.   Id. § 370.   As a general rule, an injunction will not lie in a naked case of trespass, where there is no priority of title, and where there is a legal remedy for the intrusion.   There must be something particular in the case so as to bring the injury under the head of "quieting possession," or to make out a case of irreparable mischief.   Livingston v. Livingston, 6 Johns. Ch. 500.   In Dyeing Establishment v. Fitch, 1 Paige, 97, a preliminary injunction to restrain a party from running a steamboat and landing his passengers at complainant's dock was dissolved.   The court there held that a preliminary injunction before answer rests in the discretion of the court, and ought not to be granted unless the injury is pressing and the delay dangerous.   The learned judge, in his opinion, says:

"I can readily see that retaining the injunction may produce great injury to defendants, and for which they would be entirely without remedy, if it should finally appear that they were only in the exercise of their legal rights."

But in that case the defendants claimed that the place was a public dock, and that all persons had a right to make use of it, and it does not appear that there was any other dock near for the landing of passengers, and, if defendants in that case were restrained, it would not only greatly injure their business, but would also be a detriment to the traveling public.   We think the case at bar is clearly distinguishable from the case above cited, and in the manner as above indicated.

Where a motion is made to dissolve an injunction, the case must be viewed in the same manner as if it were an original application for the injunction, and opposed by defendant's counsel.   If the complainants were now asking for this preliminary injunction, is this a case in which it would be proper for this court to grant their application?   Dyeing Establishment v. Fitch, 1 Paige, 97.   We are of the opinion that in this case this question must be answered in the affirmative.   We have formed this opinion from careful examination of the law, relative to the granting of preliminary injunctions, as above referred to, and also from the examination of the important questions raised by the parties upon this motion.   It becomes necessary to construe the statute upon which the defendants rely in determining the questions here presented; and in construing that statute we naturally are led to the examination of the statutes preceding the one in question which relate to the same subject-matter and which led to the enactment of the statute in question.   Chapter 49 of the Laws of 1867 was designed to apply only to associations or companies competing in the business of transporting property on railroad cars, either for themselves or others; and as to them no preference for the transaction of business relating to or connected with such transportation, either upon the cars or in the depots or buildings or upon the grounds of the railroad corporation, should be granted to any one of them; but each of such associations shall be afforded equal terms of accommodation, privileges, and facilities in the transportation of

property. We think this the true interpretation derivable from reading the whole section together. This provision was amended, and substantially re-enacted, by chapter 565, Laws 1890, § 34. There is a change in the phraseology, and a few words added. The last clause of section 34 provides that "no preference for the trans-action of business upon its cars or in its depots or buildings or upon its grounds shall be granted by any railroad corporation to any one of two or more persons, associations, or corporations, competing in the same business or in the business of transporting property for themselves or others." The first and only other clause relates to the giving notice of time for starting and running trains, and the accommodations to be furnished for the transportation of passengers and property. According to section 182, the provisions of section 34 must be construed as a continuation of the provisions of section 36 of the act of 1867, "modified or amended according to the language employed, and not as new enactments." As we have said, the words in the act of 1867, "competing in the business of trans-porting property for themselves or others," had reference only to the transportation of property upon railroad cars, and were not designed to apply to associations or companies engaged simply in the carrying of goods to or from the depots, or to and from different points in cities or villages. That this was the evident intention of the legis-lature appears from the repeated use of the words, "such competing companies or associations," in the second clause of the second sentence of section 36. But since that clause has been embodied in a separate section (35) in the act of 1890, and the words quoted have been expunged, it becomes necessary to ascertain and determine the true interpretation to be given section 34 of that act separately con-sidered with reference to the terms in which it is expressed, and also regarding the provisions of the act of 1867, from which it was imported. What is meant by the phrase, "competing in the busi-ness of transporting property for themselves or others?" To whom does it apply? Who are embodied within it? Shall a larger or more extensive signification be given these words than they pos-sessed in the act of 1868. This is not "a new enactment," but a "continuation" of the provisions of section 36 of the Laws of 1867. True, the section must be read as "modified or amended, according to the language employed," but here the language employed is the same as that in the act of 1867, viz. "the business of transporting property," and therefore should be given the same signification as it formerly possessed. The predominant idea in the mind of the lawmakers was to regulate the transportation of goods and property upon railroad cars. That was the principal object to be accom-plished, the main purpose to be fulfilled. They were legislating only upon that subject, and all matters necessarily incident thereto; and in determining the extent of the provisions of the statute, the whole extent of its intention or provisions, regard must be had to the ob-jects within the purview of the statute, and thus determine its limit and scope. It would seem that it was not within the con-templation of the legislature to legislate with regard to persons, as-sociations, or companies engaged in the business of "transporting"

or carrying goods in and along the public streets or highways. The words "transport," "transportation," are frequently employed throughout the statute, but they have reference only to the business of transportation upon the cars.    To apply the word "transporting," as used in this section 34, to the business of draymen or truckmen calls for a strained construction of the statute.    That business was surely not within the contemplation of the legislature, nor is it within the purview of the statute.    Judicial interpretation or construction will not go to the extent of holding that a statute designed to regulate the transportation of property upon railroad cars applies to draymen and truckmen because they may be "competing in the business of transporting property" along or upon the streets of a city or village, and mainly or incidentally to and from the freight depots of a railway.    In the absence of any legislative expression indicating that such persons or such business were intended to be benefited or protected by the act, such an interpretation of the statute is unwarranted.    The language used will not bear such an interpretation.    It is inconceivable that the legislature intended to embrace in the same category draymen and express or dispatch companies, as "competing in the business of transporting property for themselves or others."    Quite a difference, there would seem to be, in the nature, character, and extent of the business, between a person conveying goods to and from the freight depots and the great express companies, shippers, and forwarders.    Such a classification would present a legislative anomaly, and be a reflection upon the intelligence of the lawmakers to impute to them so gross a lack of the proportion and fitness of things, or as possessing the sense of disproportion in so large a degree.    However this may be, it cannot successfully be maintained that hackmen "compete" in the business of transporting property, for they are but carriers of persons.    That is the business in which they are engaged, the carrying of baggage being merely incidental thereto.    In determining the nature, kind, or character of the business, and in expressing or designating it by some term or word, it is the principal—the main—characteristic or purpose of the business that is to be considered, and that will predominate.    Section 34 provides that no preference shall be granted to any person, etc., "competing in the same business," but there is no description of the business intended.    Taking it literally as applying to all kinds of business that might be transacted on the cars, depots, etc., if the company granted the privilege of keeping a restaurant, newspaper stand, peddling on the cars, etc., it would be contrary to the statute.    It is reasonable to presume that certain words that should have been used to define the nature of the business were omitted through oversight, and, as they were supplied by the amendment of 1892, (chapter 676,) it becomes unnecessary to further consider the original section.    That amendment provides:

"No preference for the transaction of the business of a common carrier upon its cars, or in its depots or buildings or upon its grounds, shall be granted * * * to any one of two or more persons, associations or corporations competing in the same business or in the business of transporting property for themselves or others."

The question arises whether the hackmen are "common carriers" within the purview of the statute. The last clause must still retain the meaning it possessed in the statutes from which it was derived. Regard must be had to the original statutes in determining the extent and scope of the present one. Do the words "common carrier" apply as well to hackmen or draymen as to express, dispatch companies, shippers, and forwarders? Was it intended by the legislature to place them all in the same category—carriers of persons and carriers of property, carriers of persons and property upon and along the public streets and highways by means of horse and vehicle, and common carriers upon railroad cars? When the legislature speaks of common carriers in a statute regulating the transportation of persons and property by railroad companies, transportation, express, or dispatch companies and shippers, is it proper to give to those words such an interpretation as shall embrace carriers of persons and property through and along the streets of a city in hacks, cabs, or drays? We cannot conceive that the legislature intended to intermingle subjects so diverse in their nature and character in one sentence,—the business of conveying goods or persons to and from the depots, and the business of transporting, forwarding, or shipping property over railroads. It would be most unusual, in a provision designed to benefit or protect hackmen and draymen, to designate them simply as "common carriers," without any other words or expressions to indicate they were intended, and especially so when it clearly and unquestionably appears that the statute was primarily enacted for the protection and benefit of persons or companies engaged in the business of common carriers of property over railroad lines. Since there is considerable uncertainty in the books in respect to the application of the term "common carriers" to licensed hackmen or draymen, we would not be justified in holding or inferring that the lawmaking power intended to classify them with those who are clearly and strictly common carriers. To do so would be a very liberal interpretation indeed. The carriers within the legislative contemplation were carriers over and upon railroad lines, and not carriers using horse power upon highways. We would not be justified in holding that the legislature, in enacting a law for the transportation of persons and property upon railroad cars, had also in mind carriers by means of horses and vehicles, in the absence of any expression indicative of such an intention. Such carriers do not come within the purview of the statute. but are extraneous to it. The business of carrying goods and persons to. and from the depot does not come within the scope of a statute regulating transportation from town to town, from city to city. They are not common carriers, within the meaning of this statute, however proper it may be to impose upon them the liability of a common carrier, and to designate them as such; and, in view of the uncertainty existing as to the acceptance of that term, it would be an unreasonable supposition that the legislature used it in this statute in such a sense. Indeed, the learned counsel for defendants were put to extended argument and the preparation of an elaborate brief to establish that hackmen may be properly called "common

carriers." If the term "common carriers" means "draymen," this would enlarge the scope of the last clause, which had heretofore been used as meaning transportation over the railroads, and not as relating to conveying goods to and from depots. The court is asked to construe the statute so as to provide that hackmen and draymen shall be entitled to equal accommodation and facilities for the transaction of their business in soliciting the patronage of the company's passengers upon the cars, in the depots and buildings, and upon the grounds of the company, and that no preference or advantage shall be granted to one over the other. To attempt to do this would amount to a usurpation of legislative functions. We are unable to perceive that such a purpose was intended to be accomplished by the legislature merely from the use of the words "common carriers," or are we at liberty to draw such an inference? If such a purpose was within the intention of the legislature, it is reasonable to suppose that appropriate words would be found to give it expression; but here there is not the slightest reference in the entire section to the business of hackmen or draymen. We are asked to give to the words "common carriers" a comprehensive all-embracing meaning, so as to include carriers of all kinds and description who may have any business to transact upon the cars, in the depots, etc. "We are 'common carriers,'" say the defendants; "ergo, we have a right to solicit business upon the company's grounds, or at least no preference shall be granted to any one or more hackmen in affording accommodation or facilities for such purpose." But that business was not germane to the subject upon which the legislature was acting. It is not customary to speak of hackmen and draymen as "common carriers," nor even as "carriers," in the strict sense given to those terms when speaking of railroads or vessels; nor do we think that they are ever so designated in statutes or ordinances.

According to the position taken by defendants' counsel, the legislature has provided in one and the same sentence that no preference shall be given to one person or corporation engaged in the business of transporting property over railroad lines for themselves or others as common carriers or otherwise in respect to the accommodations or facilities for the transaction of such business upon the cars, depots, or grounds, nor shall any preference be given to one hackman or drayman in the use of the cars, depots, or grounds for soliciting the custom of passengers, etc. Is this a fair, reasonable, or justifiable interpretation of the legislative expression? Surely there is nothing in the statute from which we can even infer or presume that the legislature intended to legislate upon the business of hackmen. The court has no power to recast the sentence and insert the appropriate language. We must extract the sense from the words used, and not inject sense into them by extending the scope of the statute beyond the particular subject-matter. When words have a definite and generally well-known meaning, the courts are not permitted to go elsewhere in search of conjecture to restrict or extend the meaning. McCluskey v. Cromwell, 11 N. Y. 601. Assuming that licensed hackmen are common carriers of persons, it does not

necessarily follow that they are "common carriers" within the purview of the statute. The usual, common, and ordinary acceptation of that term is restricted·to carriers of goods, chattels, and merchandise. When carriers of persons are spoken of, they are designated as· "common carriers of passengers," or "passenger carriers," and when the legislature, in legislating upon the subject of railroad transportation, provides that no preference for the transaction of the business of a "common carrier" upon the cars, in the depots, or upon the grounds, shall be granted, etc., that term must be restricted to carriers of freight, in the absence of other words indicative of the more extensive signification. "Common carriers" are carriers of property, unless from the context it appears that carriers of persons are intended. The fact that the last clause of the sentence embraces common carriers of freight, and therefore the term "common carriers" in the beginning of the sentence is a superfluous or tautological phrase or expression if restricted to carriers of freight, is not sufficient to warrant its extension and application to the business of hackmen. Hackmen have no legal right to transact their business of "common carriers" in soliciting the patronage of passengers upon the cars or in the depots or upon the grounds of the company, nor does the statute purport to give to all of them that right if the company deems it fit and proper to grant it to one. This court is not justified in trespassing upon the legislative domain, nor in usurping legislative functions or exercising legislative power in the premises. Let the legislature speak plainly, and in no uncertain terms, and the courts will enforce its enactment. The judiciary should not attempt to make laws for the people by the undue and unwarrantable stretching of statutory provisions so as to embrace within them provisions not within their purview, but, on the contrary, outside the scope of the statute and extraneous to it.

It is the railroad company alone that has the exclusive right to transact ·the business of common carriers of persons or passengers upon its cars or in its depots and upon its grounds. Counsel for plaintiff truly says that the purpose of the original statute was to regulate the treatment by railroad companies of those with whom they necessarily come in contractual relations in doing the business of a carrier, and that this purpose has not been departed from in any of the subsequent amendments or alterations in the form or expression of its provisions. There is much force in the contention that the "common carrier" referred to is the railroad company itself, otherwise this provision of the statute would afford no protection to shippers of grain against discrimination in favor of another, because, although they are "competing in the same business," there is no· "preference ·for the transaction of the business of a common carrier" shown, they not being engaged in that business, but their business or dealings are with the common carrier; that is, the railroad company. Consequently, if the term "common carriers" does not refer to the company, then the shippers are left without protection from discrimination. Again, it is evident that persons engaged in the "business of transporting property for themselves" are not engaged in the transaction of ·the business of a "com-

mon carrier" upon the cars, etc., but their transactions are with the carriers, so it would be impossible to grant them a "preference for the transaction of the business of a 'common carrier.'" The purpose of the statute was to prevent discrimination among carriers, such as express or dispatch companies or associations, or persons engaged in that business, or among competing shippers, whether they are engaged in the business of transporting property for others or in shipping for themselves. If this section relates only to those engaged in the transaction of the business of a common carrier upon the cars, depots, or grounds of a railroad company, there is no other provision whatever in the railroad law to prohibit discrimination by a railroad between shippers who are rivals in the same business. It is obvious that it was the original purpose of this provision to protect persons coming into contractual relations with the railroad itself in its capacity as a carrier. To give to this statute in its present form a different meaning, and to support the contention of the defendants, effects a radical and complete change in its scope, and tends to make chaotic what was before simple and proper, and would leave competing shippers who may not happen to be engaged in the business of a common carrier without protection. Whether the court adopts the interpretation of the words "common carriers" as referring to the railroad company itself or as applicable only to other carriers of freight and merchandise over railroad lines, it will not aid the defendants in this case. However that may be, the court is firmly of the opinion that the term has no application, in this statute, to persons engaged in the business of carrying passengers in cabs, hacks, and omnibuses. Hackmen, as "common carriers" of persons, have no right to transact their "business" upon railroad cars. Their business is to carry persons from place to place over and along the public highway. The primary meaning of the term "common carrier" is one who undertakes for hire to transport the goods of such as choose to employ him from place to place. Allen v. Sackrider, 37 N. Y. 341. He stands in the position of an insurer, and is liable for accidents and thefts, and even for a loss by robbery. He is answerable for all losses which do not fall within the excepted cases of the act of God (meaning inevitable accident without the intervention of man) and public enemies. "But the proprietors of stage coaches, whose employment is solely to carry passengers, (such as hackney coachmen,) are not deemed common carriers, (but rather passenger carriers,) although, as to the passage or luggage of the passengers, they may incur the same liability as common carriers." They are not responsible for mere accidents happening to the persons of passengers without any default whatever on their part. On the other hand, they are responsible for the exercise of the highest degree of care and diligence, or, as it has been expressed, for all diligence in the carriage of passengers as far as human foresight and care will go." Story, R. R. §§ 498, 499. The opinion of the court in Wyckoff v. Ferry Co., 52 N. Y. 34, is particularly applicable to hackmen: "A ferryman is not a common carrier of property retained by a passenger in his own custody and under his own control, and liable, as such, for all losses.

and injuries except those caused by the act of God or the public enemies." He does not assume all the responsibility of a common carrier. Property carried upon a ferryboat in the custody and care of the passenger is not at the sole risk of either the ferryman or the owner. Both have duties to perform in respect to it. The liability of a common carrier in all its extent only attaches where there is an actual bailment, and the party to be charged has the exclusive custody and control of property for carriage. A ferryman does not undertake absolutely for the safety of goods carried with, and under the control of, the owner; but he does undertake for their safety as against the defects and insufficiencies of his boat and other appliances for the performance of the services, and for the neglect and want of skill of himself and his servants. See Mayor, etc., v. Starin, 106 N. Y. 11, 12 N. E. 631; Hutch. Carr. §§ 59, 61; Ray, Neg. Imp. Dut. pp. 2, 3, 19.

Counsel for defendants cite the case of Durant v. Railroad Co., (decided at special term.) That case is certainly an authority for the position that under the act of 1890 an exclusive privilege cannot be lawfully granted to one of two or more proprietors of stage lines or other like common carriers of persons. But it should be observed that the question arose upon a motion for a preliminary injunction, and the opinion of the court contains no discussion whatever as to the true meaning or effect of the act of 1890, and therefore it cannot be considered of much weight upon the question of statutory interpretation or construction. Besides, the granting of a preliminary injunction upon a doubtful right against the owner of land in possession is not consistent with the well-established principles of equity applicable to such cases. However, that case does not decide that the contract offered by this plaintiff to all persons engaged in the business of carrying passengers to and from its depots amounts to an unlawful preference and an unjust discrimination if accepted by one or more of such persons. On the other hand, counsel for the plaintiff refers to the case of Hanley v. Railroad Co., (Westchester Special Term, June 13, 1891,) in which Judge Dykeman refused to grant a preliminary injunction to the plaintiff against the railroad company, under similar circumstances; but we do not regard such denial as decisive of the defendants' rights here. In Saunders v. Railroad Co., (not reported,) the defendant had granted an exclusive hack privilege at Poughkeepsie to a man named Gillan, and Saunders brought an action to compel the company to allow him the same privilege. Judge Barnard held, upon the authority of Barney v. Steamboat Co., 67 N. Y. 301, that the company had the right to contract with Gillan for the sole right to solicit baggage of passengers on their inclosed grounds. The statute of Massachusetts provides that "every railroad corporation shall give to all persons or companies reasonable and equal terms, facilities and accommodations, for the transportation of themselves, their agents and servants, and of any merchandise or other property upon its railroad, and for the use of its depots and the buildings and grounds." In Railroad Co. v. Tripp, 147 Mass. 35, 17 N. E. 89, the court held that a railroad company may contract

with one to furnish the means to carry incoming passengers, or their baggage and merchandise, from its stations, and may grant him the exclusive right there to solicit the patronage of such passengers, and that such an agreement did not come within the provisions of the statute; that the statute, in providing that the railroad company shall give to all persons equal facilities for the use of its depots, obviously means a use of right. It does not intend to prescribe who shall have the use of the depot, but to provide that all who have the right to use it shall be furnished by the railroad corporation with equal conveniences. The statute applies only to relations between railroads as common carriers and their patrons. It does not enact that a license given by a railroad company to a stranger shall be a license to all the world. If a railroad company, for the convenience of its passengers, allows a baggage expressman to travel in its cars to solicit the carriage of the baggage of passengers, or to have an office in its depot for receiving orders from passengers, the statute does not require it to furnish equal facilities and conveniences to all persons. The fact that the defendant, as the owner of a job wagon, is a common carrier, gives him no especial right under the statute. It only shows that it is possible for him to perform for passengers the services which he wishes to solicit of them. But we have not been referred to any decision or dictum in England or in this country that a common carrier of passengers or their baggage to and from a railroad station has any rights, without the consent of the railroad company, to use the grounds, buildings, and platforms of the station for the purpose of soliciting the patronage of passengers, or that a regulation of the company which allows such use by particular persons and denies it to others violates any right of the latter. The defendant, in his business as solicitor of the patronage of passengers, held no relations with the plaintiff as a common carrier, and had no right to use its station grounds and buildings. It should be said that this decision was rendered by a divided court. The minority of the court construed a statute providing for equal terms and facilities and accommodations for the transportation of passengers and property upon the railroad and for the use of the depot and other buildings and grounds, as applying to the carrying or transportation of persons and property by means of hacks, cabs, omnibuses, drays, trucks; that, as the last clause of the section makes provision for carriers connecting by railroads, the preceding clause was intended to make provision for other connecting carriers:

"Stages and expresses are the only common carriers of passengers and of merchandise to and from many places in the commonwealth, and, in connection with railroads, often form a continuous line of transportation. The statute was intended to prevent unjust discrimination by a railroad corporation between common carriers connecting with it in any manner, and to require that the railroad corporation should furnish equal terms, facilities, and accommodations in the use of its depots and other buildings and grounds for the interchange of traffic. The railroad company can probably prohibit all persons from soliciting business for themselves on its premises. Whatever may be its right to exclude all common carriers of passengers or of merchandise from its depots and grounds who have not an order to enter, given by persons who are or who intend to become passengers, or who own, or are

entitled to the possession of, merchandise which has been or is to be transported, it cannot arbitrarily admit to its depots and grounds one common carrier and exclude all others.   The effect of such a regulation would be to enable a railroad corporation largely to control the transportation of passengers and merchandise beyond its own lines, and to establish a monopoly not granted by its charter, which might be solely for its own benefit, and not for the benefit of the public.   While the statute, from the nature of the subject, must be construed as to permit the corporation to make such reasonable regulations as are necessary to enable it to perform, without inconvenience, its duties as a common carrier, and such as the size and condition. of its depot and other buildings and grounds require, yet the facts stated in the report cannot be held sufficient to warrant the plaintiff in admitting one company of expressmen to, and excluding all others from, the advantages of bringing express wagons within its grounds, and of accepting or of soliciting employment as a common carrier of baggage from the passengers arriving at its depots.   The report does not show that any inconvenience to the company or to the public using the railroad was occasioned by the defendants entering the grounds for the purpose of soliciting employment as a common carrier of baggage.   Upon the facts as they appear in the report it cannot be said that, within any reasonable construction of the statute, reasonable and equal facilities were granted to the defendant and to Porter, or that any necessity existed for giving a preference to the latter." "The late English cases seem to show that under the English statute the public convenience or inconvenience is not exclusively the test, but is only one element to be taken into account in considering what is an undue and unreasonable preference, and that a common carrier may be regarded as representing all those persons who may choose to employ him.   While the English statute provides against undue and unreasonable preferences and advantages, it does not in terms provide that all persons and companies shall have equal facilities and accommodations for the use of the depot and other buildings and grounds of a railroad corporation."

The constitution of Missouri, under the heading "Railroads," provides that "no discrimination in charges or facilities in transportation shall be made between transportation companies and individuals, or in favor of either by abatement, drawback, or otherwise."

In Cravens v. Rodgers, 101 Mo. 247, 14 S. W. 106, the court held it was contrary to the spirit of this provision for a railroad company to give the plaintiff "the exclusive privilege of approach to nearly one-half of its platform, and that the most desirable and advantageous half for procuring passengers, and thereby deny it to defendants," who claimed that the plaintiff thereby enjoyed greater privileges and advantages in soliciting the carrying of passengers and baggage.   The ground of the decision was that the defendants could not approach the platform allotted to them without some difficulty in dry weather, and in wet weather it was very hard to do so; that the plaintiff's vehicles would have a better chance of obtaining passengers than defendants', "although there is some evidence tending to show the chances are equal."   But it does not appear that there was any discrimination "in facilities in transportation between transportation companies and individuals by abatement, drawback, or otherwise," nor is it stated that the passengers desiring to use defendants' vehicles were in any way discriminated against, or put to inconvenience, discomfort, or in any manner prejudiced.   The decision contains no discussion whatever of the common-law or statutory rights of hackmen or of railroads.   The decision is not founded upon precedents nor principles governing

like cases, and we would not be justified in following it as an authority.

The statute of Michigan provides that "all railroad corporations shall grant equal facilities for the transportation of passengers and freight to all persons, companies or corporations." In Bus Co. v. Sootsma, 84 Mich. 194, 47 N. W. 667, the court construed this statute as applying to the transportation of passengers and freight by means of hacks, omnibuses, drays, trucks, etc., and therefore that no exclusive privilege could lawfully be granted to one hack or omnibus owner; that the company was not probably bound to grant any facilities for the solicitation of passengers, but that it could not grant such facilities to one and deny them to others. But also, independent of the statute, "it was contrary to the spirit of our laws, and against the public policy that refuses to encourage or foster monopolies in any kind of business," to allow one hack driver to use the private grounds of the company, and refuse all others, "for no other reason than that it is for its own profit or pleasure." But the plaintiff showed that the reason for granting this privilege was for the benefit, convenience, and protection of the passengers who had been theretofore defrauded by the hackmen. The ground of the decision, however, was that the hackmen could not be discriminated against, without any regard to the public convenience or inconvenience, advantage or disadvantage,

In Griswold v. Webb, 16 R. I. 651, 19 Atl. 143, the court approved Barney v. Steamboat Co., 67 N. Y. 301, and observed that a railroad company had a right to say "that no one shall come there to solicit trade simply because it may be convenient for passengers, and so to say that none except those whom it permits shall solicit in the business of hacking or expressing;" and, referring to the recent English cases, that "they relate chiefly to the question whether a prohibition to one to ply for passengers within a station, when the same right is granted to another, is an undue preference under the statute. It is generally held that it is not."

We have now examined the statute under which the defendants claim, and considered the manner in which it should be construed, viewed from the wording of the statute itself and in the light of decisions pertaining to that and similar statutes. Let us now consider what are the common-law rights of hackmen to transact their business in the depots and buildings and upon the grounds of railroad companies. In Barney v. Steamboat Co., 67 N. Y. 301, the court held that a common carrier may—

"Carry on, in connection with his business of carrier, any other business, and may use his property in any way he chooses to promote his interests, not inconsistent with the duty he owes to passengers. The vessel or vehicle which he uses is his own, and, except to the extent to which he has devoted it to public use by the business in which he has engaged, he may manage and control it for his own profit and advantage, to the exclusion of all other persons. He may establish, for the convenience of passengers and for his own profit, on his car or vessel, an agency for the delivery of baggage of passengers, and exclude all other persons from entering to solicit or receive orders from passengers in competition with the agency established by him. This is in no just sense a monopoly. It is simply saving to the carrier a legitimate advantage which his position and business give him. The plain-

tiff sought passage for the purpose, among other things, of taking, while in the boat, in his capacity as expressman, orders from passengers for the delivery of baggage. The defendant had placed an expressman on the boat for that purpose, and it is clearly inferable that he had a pecuniary interest in the business."

In this case, however, the carrier was not exercising a franchise granted by the state.

The opinion of the court in The D. R. Martin, 11 Blatchf. 234, is appropriate to this case:

"A steamboat company or a railroad company is not bound to furnish traveling conveniences for those who wish to engage in their vehicles in the business of selling books, papers, or articles of goods, or in the business of receiving and distributing parcels or baggage, nor to permit the transaction of this business in their vehicles when it interferes with their own interest. If a profit may arise from such business, the benefit of it belongs to the company, and they are entitled to the exclusive use of their vehicles for such purpose. This seems to be clear, both upon principle and authority. * * * A carrier, like all others, may bestow a favor when he chooses. Rights, not favors, are the subject of demand by all parties indiscriminately. The incidental benefit arising from the transaction of such business as may be done on board a boat or car belongs to the carrier, and he can allow the privilege to one and exclude from it another at his pleasure. * * * This individual is under their control, subject to their regulations, and the business interferes in no respect with the orderly management of his vehicle. But, if any one who thinks fit can enter upon the performance of these duties, the control of the vehicle and its good management would soon be at an end. The sale or leasing of these rights to individuals, and the exclusion of others therefrom, comes under the head of reasonable regulations, which the courts are bound to enforce. The right of transportation, which belongs to all persons who desire it, does not carry with it a right of traffic or of business."

The court held that an express agent, though a passenger, might be lawfully removed from a steamboat upon his refusal to desist from pursuing his business on the boat.

In Railway Co. v. Langlois, 9 Mont. 419, 24 Pac. 209, the company granted to Lavell the exclusive right to drive and stand his hacks along the edge of the passenger platform, but allowed all other hackmen the privilege of standing their hacks in the depot yard to deliver and receive passengers at a point on said platform 50 feet distant east from the place allotted to Lavell. The company asked for an injunction to restrain defendant from driving or standing hacks at said platform at the west side of its depot buildings, or within 50 feet thereof. Defendant alleged that the place allotted Lavell was the portion of the platform where passengers alighted from the trains; that the portion of the platform east thereof allotted to defendant was used almost entirely for handling freight and baggage, and the ground alongside was always used by baggage and freight wagons; and that, if Lavell were allowed the exclusive use of the platform west of the station, it would give him the entire control of the business of carrying passengers from the depot, to the discomfort, inconvenience, and detriment of the passengers. Defendant denied the right of the company to "grant the exclusive use of a portion of the platform to one party to approach and occupy the same to convey passengers thereto and receive passengers therefrom, and exclude all others from so doing." The court said that the grant of the special privilege to Lavell, "and the exclusion

of all others from approaching thereto to land or receive passengers,
was not a reasonable regulation." It will be noticed that the com-
pany claimed the right to exclude defendants from landing or re-
ceiving passengers at the proper and convenient place devoted to
that purpose, even though they had a previous order from the pas-
sengers, and the court remarked that—

"The demands in the case at bar go beyond those urged in any of the cases
cited. * * * All passengers in common are entitled to equal opportuni-
ties and conveniences of place to approach and depart from plaintiff's trains.
But the plaintiff contended that it may grant the exclusive use of a large
portion of its platform to one party at which to land passengers for depar-
ture on its trains, or to receive passengers from said trains; and, if the pas-
senger is willing to contract with this one party for transportation thereto or
therefrom, such passenger may have the convenience of landing or depart-
ing from that portion of the platform, otherwise he must land fifty feet away
therefrom, or go to another portion of the platform, incumbered with ex-
press and baggage wagons and the handling of freight and baggage. A
passenger is entitled to the same conveniences and facilities for approaching
and leaving the depots as other passengers. If he contracts with another
than Lavell to carry him there and be there to receive him on his return, he
must alight from his carriage and be received by it fifty feet away from
said platform, or be landed where the express and baggage matter is handled,
while the passenger who employs Lavell may land and depart from this con-
venient portion of said platform. Or, if a party desired to use his own car-
riage to bring him to the station or receive him on his return, it seems the
same condition would prevail. * * * Suppose all other hackmen will per-
form the same service for half the sum charged by Lavell, are not the pas-
sengers entitled to the benefit of this competition? Has not the passenger
the right to call these other hackmen to his service? And if he does call
them, has he not a right to have them approach the platform at the same
place, or at least have an equal and common chance to approach at this
same convenient place, as his copassenger who employs Lavell? If any
of the passengers do accept these better terms, they must suffer the discrim-
ination of being denied at that portion of the platform granted exclusively
to Lavell."

These extracts from the opinion of the court will suffice to show
that the decision was placed upon the ground, not that there was an
unjust discrimination against the hackmen, but rather that there
was an unjust discrimination against the equal rights of passengers,
and solely for that reason the exclusive grant or privilege was held
void, upon "grounds of sound reason, public policy, and the general
principles of law governing common carriers, as well as the pro-
visions of our constitution that 'no distinction in charges or facilities
for transportation of freight or passengers shall be made by any
railroad.'" The court distinguished the case in Railroad Co. v.
Tripp, 147 Mass. 35, 17 N. E. 89, on the fact that there "all the
hackmen were allowed equal privileges to come to the station to
deliver passengers and baggage and to receive such as they had
previous orders for." But, strange to say, while approving of the
general principle of law in the case cited, the court goes on to ques-
tion the conclusions reached by a majority of the court, the decision
made upon the facts existing in that case. A comparison of the
two cases will show that if the facts existing in the Montana case
were elements in the Massachusetts case the decision would have
been the same. In connection with the Massachusetts case above
referred to, (Railroad Co. v. Tripp, 147 Mass. 35, 17 N. E. 89,) see

the case of Express Co. v. Railroad, 117 U. S. 1, 603, 6 Sup. Ct. 542, 628, and observe the construction put upon the constitutional provision therein quoted. It may very properly be cited as an authority for this proposition that by the common law the railroad was under no obligation as a common carrier to afford any accommodations to hackmen for the transaction of their business. A statute in these general terms must be limited and restricted to the duties or obligations which it owes to the public generally in the performance of the functions of a carrier, and does not create any new duties or obligations to particular individuals in respect to the carrying on of their business, nor prevent the granting of any exclusive privilege to one of them. The opinion is in accord with the decision in Massachusetts, and founded upon the same general doctrines. There remains one further question raised upon this motion. The plaintiff claims that it has offered to these defendants and all other hackmen at Niagara Falls the same privileges and facilities in its depot, buildings, and ground upon their complying with the terms and conditions prescribed by the company. It claims that these conditions and terms are reasonable, and that it has acted in perfect good faith in its offer. The defendants claim that the compensation required by the plaintiff for these privileges is unreasonable, and that the defendants are unable to comply with them. In Vickers Express Co. v. Canadian Pac. Ry. Co., 13 Ont. App. 210, affirming 9 Ont. 251, the statute provided that railway companies "shall grant equal facilities, on equal terms and conditions," to any express company demanding the same. Held that, in the absence of collusion, the court would not inquire into the reasonableness of the rates charged to an express company, they being the same prescribed in a contract previously made with another express company. That, in the absence of fraud, the court has no right to vacate or alter such contract, or to require the parties to enter into a new and different contract. "The defendants have chosen to make a special contract with the defendant express company over their great lines and its branches, the latter paying a large sum for the privilege, and a minimum mileage rate. Having done this, the legislature fastens on them the liability to grant equal facilities, on equal terms and conditions, to any other express company requiring the same. They answer this by offering to place plaintiff's company under the same terms and mileage rate as the defendant express company pays for the same. The railway company produce their contract with the first company, and declare their readiness to deal with the second company on precisely the same terms as to remuneration." As was said in the Express Cases, 117 U. S. 29, 6 Sup. Ct. 542, 628, the court cannot determine how the compensation shall be measured, or make for the parties such a contract for the business as in its opinion they ought to have made for themselves.

Upon full consideration of the questions presented and examined we are led to the conclusion that "by the common law the railroad is under no obligation, as a common carrier, to afford accommodations to hackmen for the transaction of their business, and that

the statute invoked by defendant is limited and restricted to the duties or obligations which it owes to the public generally in the performance of the functions of a carrier, and does not create any new duties or obligations to particular individuals in respect to the carrying on of their business, nor prevent the granting of any exclusive privilege to one of them." It follows, therefore, that in our opinion the injunction was properly granted, and should be continued. Motion to dissolve injunction denied, with $10 costs.