CASE 15—APPLICATION FOR FERRY PRIVILEGES—JUNE 17.

# Clark, &c., vs. White, &c.

APPEAL FROM ESTILL CIRCUIT COURT.

1.  A ferry having been established from the *south to the north bank* of the Kentucky river, in Estill county, in 1813. From the continued use and enjoyment of the privilege of landing on the north bank, under a claim of right, for more than fifty years, a grant of such privilege will be presumed.

2.  The ferry having been re-established, since the adoption of the Revised Statutes, on the application of the owner of the south bank, to a public highway leading to the ferry landing on the north bank, no grant or writ of *ad quod damnum* was necessary to secure the privilege of landing in said public highway;

    And as no public necessity required the establishment of another ferry, the county court should have rejected the application therefor of the owner of the land on the north bank. (*Revised Statutes, secs. 6 and* 16, *chap.* 39, 1 *Stant.*, 539.)

S. TURNER,                                        For Appellants,
                              CITED—
  *Rev. Stat.,*⁻secs. 1, 4, 5, 8, 1 *Stanton,* 538.
  *Civil Code, secs.* 20, 21, 32, 13.
  5 *Dana,* 100; *Churchill vs. Grundy.*
  1 *Bibb,* 495; 4 *J. J. Marshall,* 539.
  3 *Marshall,* 321; *Gibbons vs. Pollard.*


C. F. BURNAM,                                     For Appellees,
                              CITED—
  5 *Dana,* 101; *Churchill vs. Grundy.*
  3 *J. J. Mar.,* 669; *Lytle vs. Breckinridge.*
  1 *Duvall,* 139; *R. and L. T. Road Co. vs. Rogers.*
  1 *Bibb,* 495; *Lawless vs. Rees.*
  *Rev. Stat., sec.* 16, " *Ferries,*" 1 *Stant.,* 542.
  16 *B. Mon.,* 699; *Newport vs. Taylor.*

JUDGE PETERS DELIVERED THE OPINION OF THE COURT:

This controversy arises out of an application by William J. Clark to the Estill county court, at its January term, 1867, for the privilege of keeping a ferry in said county, on the Kentucky river, from the north to the south bank thereof, where the Irvine and Richmond Turnpike Road crosses said river; claiming to be entitled to said privilege on the ground that he is the owner, proprietor, and is in possession of the land on the north side of said river where said turnpike road crosses it, and also above and below said crossing, and because there is no legal ferry kept at that place on either side of said river.

Richard White and others, claiming to own the land on the south side of the river, and claiming to keep a ferry at that place, under a grant of the privilege to do so from said county court, entered their appearance and resisted the motion; but, upon the trial thereof, the

county court granted the privilege to Clark to keep a ferry at the place designated; from that judgment White and others appealed to the circuit court, and, upon the trial of the appeal by that court, the judgment of the county court was reversed; and the motion, as to Curtis, who had, during the pendency of the litigation, bought the land of Clark, and was made a co-plaintiff, was dismissed without prejudice; and that judgment Clark & Curtis now seek to reverse.

It appears from the evidence, that as early as January, 1813, William Hern, then being the owner of the land on the south side of the Kentucky river, and residing on it, obtained the privilege from the county court of Estill to establish a ferry at the place where appellants are now endeavoring to procure the grant from said court to keep one; that Hern continued to exercise his right to keep said ferry, without interruption or cessation, up to 1831, when he sold his land, and his ferry privileges with it, to Patterson and Robert Clark, renewing his bonds as often as required by law, covenanting to keep a ferry according to law, and to give immediate passage to all people; and it furthermore appears, from the evidence, that the ferry was well kept by Hern; and after he sold, it was kept by Patterson B. Clark, his vendee, until the land and ferry privileges were sold by the Clarks to Daniel White, who, under the authority of the Estill county court, kept a ferry at the same place as long as he lived; and since his death, it has been kept by his devisees up to the present time, or by them and their lessees. That the ferry has, at all times, been well kept by Hern and his successors, who charged toll for transporting travelers, &c.; and that the ferry now kept by appellees is sufficient to do all the business, and that the public convenience does not require another ferry to be kept at that place.

When Hern obtained his ferry privileges it does not appear that the landing on the north side of the river belonged to him; and at least one witness proves that there was not then any highway established precisely at that place; but a highway has since been established there. The precise time at which it was established, however, does not appear. Whether or not the court granting to Hern the ferry right caused a writ of *ad quod damnum* to issue to ascertain the damages the owner of the land on the north side of the river would sustain by the establishment of the right of way over his land, does not appear; but the shore on the north side was used under a claim of right from January, 1813, up to some time after 1843, without interruption or question by those owning the land on the north side.

Finney proves that when he purchased the land of B. J. Clay, which the deed shows was in 1843, Hern was living on the south side, and was keeping the ferry; and that he made a contract with him, by which Hern was to ferry him free of charge for the privilege of landing on his land. But in this he must be mistaken; for Hern had sold and conveyed the land to the Clarks as early as 1831. But after Daniel White purchased the land and ferry right from the Clarks, Finney proves that White fastened or tied a rope, with which the ferry-boat was propelled across the river, to a tree on his land on the north side, and he and White had a difficulty about it, which they submitted to two friends, who settled it by deciding that White should ferry him across the river free of charge for the privilege of using the tree for fastening his rope. And other witnesses speak of that difficulty and the adjustment. This was certainly after the sale of the land by

Clay to Finney, and after Hern, and those under him, had been claiming the right to land their boat on the north shore for more than thirty years without interruption; and that right was claimed and exercised until this application was made by appellants, a period of over fifty years; from which a grant of the right, perhaps, should be presumed.

But appellees, and those under whom they claim, have, since the adoption of the Revised Statutes, and since a public highway has been established over the site of the ferry, or the landing, applied for and obtained a renewal of the grant to keep the ferry at this place. And where the ferry right is granted to the owner of the land on one side of a stream, and the landing on the opposite side is on an established public highway, the court making the grant need not in such case issue the writ of *ad quod damnum*. (*Sec.* 6, *chap.* 39, *vol.* 1, *R. S.*, 539.) The land has already been condemned for the road. The original proprietor is not injured by the landing of a ferry-boat on it, and the public, as must be presumed, benefited. Nor is the land thereby appropriated to a different purpose from that for which it was condemned. But the application of appellants was in conflict with *subsecs.* 1 *and* 2, *of sec.* 16, *of chap.* 39, *of the R. S.*, *supra*, and was, for that reason, also properly refused.

Wherefore, the judgment is *affirmed*.