## RAMÓN VALDÉS Y COBIÁN

*v.*

## LAWRENCE H. GRAHAME, Commissioner, etc.

San Juan, Equity, No. 522.

1. When the facts show that the government did not, and did not intend

III. PORTO RICO—27.

to, grant a franchise to operate a steam ferry, the utmost of the concession to the person claiming such a franchise is a permit, revocable by the executive council whenever the licensee fails to keep the terms of the license.

2. Franchises are never presumed, and doubts must be resolved against the persons setting up their existence.

3. All franchises for public service, whether revocable or exclusive or not, are subject to reasonable regulation and proper control.

4. The executive council of Porto Rico can exercise reasonable control over the public-service corporations therein.

5. A grant will not be presumed when the record exists and contradicts the presumption.

Decree filed March 7th, 1908.

*Mr. Thomas D. Mott, Jr.,* for the plaintiff.

*The Attorney General of Porto Rico,* for the defendant.

RODEY, Judge, delivered the following opinion:

This is a suit in equity by which complainant seeks to enjoin the respondent, as commissioner of the interior of Porto Rico, from carrying out the instructions of the executive council of the island, to prevent the landing of the complainant's ferry-boats at San Juan, Porto Rico, as they have heretofore for many years been accustomed to do, and asking that the court shall decree that complainant is possessed of a franchise granted to

NOTE.—*Ferries.*—For the determination of rights and duties with respect to the establishment, regulation, and protection of ferries, see exhaustive note to Sistersville Ferry Co. v. Russell, 59 L.R.A. 513.

As to necessity of franchise for ferry, see note to Virginia Cañon Toll Road Co. v. People, 37 L.R.A. 712.

And for authorities on the question of legislative power to fix ferry rates, note to Winchester & L. Turnp. Road Co. v. Croxton, 33 L.R.A. 180.

Valdés y Cobián v. Grahame.

him by the King of Spain in the year 1881, which he alleges entitles him to continue landing his ferryboats at a particular place on the water front at San Juan, and to the use of 12 meters of space of the bulkhead at such place for such purpose.

The bill prays for a decree that neither the executive council of Porto Rico, nor any other authority, executive or legislative, can deprive him of his alleged vested rights under such alleged franchise, so long as he complies with the conditions imposed on him at the time it was granted; and further, that respondent be prevented from advising or permitting other craft to land at said same place, to the exclusive use of which complainant, by reason of the premises, claims he is entitled.

Allegations are made that such action is threatened, and an injunction, as is usual, *pendente lite,* to be made permanent after full hearing, is prayed for. The bill was filed on the 4th day of January, 1908. On the 8th of that month an amendment to the bill was filed, alleging, in substance, that, under an act of Congress of July, 1902, the President of the United States, on June 30, 1903, issued a proclamation reserving to the government of the United States, for the purpose of the customs-house division of the Treasury Department of the United States, certain property and water frontage which included the frontage in question; and that, for such reason, the said landing place belongs to and can be controlled only by that government, and even then only subject to the rights of the complainant; and that therefore the insular government has nothing to do with the same. Several exhibits were filed with the bill with a view of showing the granting and existence of this alleged franchise and for the purpose of otherwise sustaining the allegations of the bill.

On that same day, January 8, 1908, a complete answer to the

Valdés y Cobián v. Grahame.

bill was filed, which in substance denies specifically that complainant ever obtained or now has any franchise of any kind or character, either to run a line of ferryboats or to land the same on the San Juan water front, as aforesaid, and denying any illegal action on the part of the executive council of Porto Rico, or on the part of the respondent, Grahame, as commissioner of the interior thereof, but, on the contrary, in substance alleging the legality of all the acts of both in that behalf; and further in substance alleging that complainant is not now and never has been possessed of any irrevocable or other franchise in the premises. The answer further sets out that the only right, if any, in this regard, which complainant is possessed of, is an ordinary permit, or revocable license, which the said executive council, as it is claimed, can, at any time it sees fit, revoke; and further alleging that any so-called right which complainant ever possessed, terminated with the change of sovereignty from Spain to the United States under the treaty of Paris. The answer then alleges that, if complainant ever possessed any franchise (which is denied), he has long since forfeited the same for failure to comply with the conditions thereof, and because of the alleged unsatisfactory and dangerous condition of the ferryboats in question; and further asserts the power of the insular government to, in any event, control the landing place in question, and regulate the landing of all craft thereat under its general police and other powers, and that it alone has power to grant public-ferry franchises, and regulate the same, and asserts that even if the complainant possesses any franchise, which, as stated, is denied, the government of Porto Rico under the law has full power to regulate and control, or to revoke and annul, the same, as it may deem proper. It further alleges that even though the ferry in question is across navigable waters of

Valdés y Cobián v. Grahame.

the United States in the bay of San Juan, that still such ferrying is intrainsular and is essentially a local enterprise, between two local points on the island of Porto Rico. That it is therefore, under the law, entirely under the regulation police power and control of the local government. That the acts of the local government complained of are a legitimate exercise of the granted and inherent power which it possesses to provide for the public safety, which it alleges is threatened by the dangerous and unsanitary condition of complainant's ferryboats, which, it claims, is shown by numerous affidavits and exhibits filed with the answer.

A rather extensive hearing was then had on the pleadings as thus far exhibited, and on the application for the temporary restraining order. The court, however, not being ready at that time to give the attention to the matter which its importance deserved, secured an agreement of counsel and the parties in open court, that matters should remain *in statu quo,* as though a restraining order *pendente lite* had been issued, until the further order of the court.

On the 22d of January, the complainant filed a set of specific exceptions to all of those portions of the answer other than the mere denials of complainant's allegations, which it is claimed set up mere legal conclusions as to the character of complainant's rights, and as to the powers of the local government of Porto Rico and the respondent, the commissioner of the interior. Both at the hearing on the 8th of January and after the filing of these exceptions, additional briefs of the parties were filed and considerable proofs taken and exhibits introduced on the issues up to that time.

After examining the question for a short time, the court concluded that any decision it might render on the issues as

then made would be unsatisfactory to both sides; and hence, on the 7th of February, called counsel before it, and requested them to submit all the proofs on all the issues they expected to raise under the bill and the answer on the merits, so that the court might consider all of the same, or such parts as might be material, and take such action on the exceptions to the answer, and as to all the pleadings, as might be proper, and make its ruling thereon even *nunc pro tunc* as to the exceptions, if that should become necessary, and that the whole cause should be finally submitted on the merits, so that an appeal from the decision would lie to the Supreme Court of the United States, with the right to either party believing himself or itself aggrieved, to give a supersedeas bond as is usual. To this proposition, after due argument in that behalf, counsel on both sides agreed, without, however, waiving any of their rights, but without objecting to the submission of the whole cause on the merits. The court thereupon entered an order setting out this agreement and fixing the 11th day of February for the submission of the final proof, which, on said day and the following days, was duly submitted. After which, arguments of counsel were heard and additional briefs were filed by each side. The cause is thus now finally submitted.

We might as well, at this point in these expressions of our views, settle the contention raised by the amendment to the bill of complaint before referred to, that the 12 meters of landing space claimed by the complainant is the property of the government of the United States, and that the insular government or its officers have no control over the same.

On the 11th day of April, 1899, Spain, by article 2 of the treaty of Paris, ceded to the United States the island of Porto Rico and other islands then under Spanish sovereignty in the

Valdés y Cobián v. Grahame.

West Indies. The sovereignty over Porto Rico thus at once changed from Spain to the United States, together with the ownership of all Spanish national public property.

On the 12th day of April, 1900, Congress passed the organic act of Porto Rico, commonly known as the Foraker act (31 Stat. at L. 77, chap. 191), and provided by § 7 thereof that all inhabitants continuing to reside in the island of the classes in that section described, "shall constitute a body politic under the name of The People of Porto Rico, with governmental powers as hereinafter conferred, and with power to sue and be sued as such." This organic act further provided in § 13 thereof: "That all property which may have been acquired in Porto Rico by the United States under the cession of Spain in said treaty of peace . . . and all property which, at the time of the cession, belonged, under the laws of Spain then in force, to the various harbor-works boards of Porto Rico, and all the harbor shores, docks, slips, and reclaimed lands, but not including harbor areas or navigable waters, is hereby placed under the control of the government established by this act to be administered for the benefit of the people of Porto Rico; and the legislative assembly hereby created shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all such matters as it may deem advisable."

On the 1st day of July, 1902, Congress passed another act (32 Stat. at L. 731, chap. 1383), providing, among other things, "that the President be, and he is hereby, authorized to make, within one year after the approval of this act, such reservation of public lands and buildings belonging to the United States in the island of Porto Rico for military, naval, lighthouse, marine, hospital, postoffices, customhouses, United States courts, and other public purposes, as he may deem neces-

sary; and all the public lands and buildings not including harbor areas and navigable streams and bodies of water, and the submerged lands underlying the same, owned by the United States in said island, not so reserved, be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island; Provided, That said grant is upon the express condition that the government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this act; And provided further, That nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the government of Porto Rico, or by any other party, under any contract, lease, or license made by the United States authorities prior to the first day of May, nineteen hundred."

It appears the President, pursuant to the authority thus conferred upon him, issued two proclamations dated respectively June 26th and 30th, 1903 (33 Stat. at L. 2314, 2315), to carry out the intention of said act of Congress, but we have not been shown that the insular government, although it authorized the same by an act of the local assembly of February 16th, 1903 (P. R. Sess. Laws, 110), has yet actually made any deed of release as required by the act of Congress, if any is necessary.

Notwithstanding a considerable contention to the contrary, made by counsel during the hearings, we are unhesitatingly of the opinion that the first of these proclamations in no manner affects the 12-meter landing space here in controversy. The only language of that proclamation which could be said to at all tend in that direction is the reservation that is made in § 3 thereof, of "All public lands and the structures thereon, situated

Valdés y Cobián v. Grahame.

on the peninsula, extending into the harbor on the south side
of the city of San Juan, Porto Rico, known as the Barrio de
la Puntilla, or Puntilla point, bounded on the north by the
south boundary of the Paseo de la Princesa, and on the east,
south, and west by the navigable waters of the harbor of San
Juan, at such port warden's line as may be established by com-
petent authority." This language, from the evidence before us,
we unhesitatingly hold, includes nothing but the peninsula or
rather land projection, which extends into the harbor on the south
side of the main portion of the city of San Juan, while the land-
ing place in question is situated on the southwest corner of a ce-
ment bulkhead extending into the harbor more than a hundred feet
east of and wholly separated from the northeast corner of this
peninsula. A set of very admirably executed ancient maps was
introduced before us, and oral testimony of some quite compe-
tent witnesses was also presented during the hearings, from
which we have no difficulty in holding that only the peninsula
or land projection proper, by any stretch of language, could
be held to be included in language referring to the "Puntilla."
In fact it was conclusively shown before us that the southern
extremity of this present peninsula or land projection, now oc-
cupied as a naval station, was, for a century or two after Span-
ish occupation of Porto Rico, a mere islet, and that in time the
swamp intervening on the north between it and the city was
filled in, thus creating the present peninsula or land projection.
It is also in evidence that this peninsula has been variously
known as the Puntilla, and the Barrio de la Marina, and even
that it consisted of portions of two barrios; but never at any
time has the landing space here in question been considered
as included within either the Marina or the Puntilla. It has
always been included within what came to be known as the

Valdés y Cobián v. Grahame.

Barrio de la Carbonera, and is situated outside of any possible port warden's line that could be reasonably expected to be drawn to bound the eastern side of the Puntilla or land projection referred to.

As to the second of said proclamations, the President, in addition to reserving other property for the government, as he was directed, also by the terms thereof reserved: "For customhouse purposes: The lots and buildings used and occupied as customhouses at Ponce, Mayaguez, and Humacao, and the right, until otherwise ordered, to the use of the lots and buildings within the Puntilla point at San Juan, now used and occupied by the custom authorities for customhouse purposes in said city."

A very considerable controversy arose during the hearing as to what was intended by the language: "Within the Puntilla point at San Juan, now used and occupied by the custom authorities for customhouse purposes in said city," used in the paragraph last above quoted.

We have no hesitation in holding, on the evidence that was introduced before us, that whoever prepared this proclamation of June 30, 1903, for the President, was not fully informed or else made a mistake, because the main customhouse buildings are situated in the northeast corner of this peninsula or land projection, and, of course, were undoubtedly intended to be and were reserved permanently to the government, the same being within what can reasonably be characterized as the Puntilla point. But it is also in evidence that, for a long time prior to the American occupation of Porto Rico, and prior to the said proclamation, and ever since, there has been a building known as the "tinglado" situated just in front of and a little to the right and east of, but including, the landing place in question. On the hearing, a spirited contest arose between the United

Valdés y Cobián v. Grahame.

States customs authorities and the local insular authorities as to which of the governments owns this building or shed. We unhesitatingly hold on the evidence before us that, for a long time previous to American occupation of Porto Rico, and ever since, the said shed or building and its lot and bulkhead or wharf have been under the absolute control of the Spanish government, and afterwards of our national government, and that it is now possessed and occupied by the customs officials of the Treasury Department,—all other occupation of the same being, in our opinion, only by the sufferance or permission of the customs authorities. We hold, though, that this tinglado and the lot it is situated on, as well as the bulkhead in front of it on the bay, which includes the landing place in question, is in the Barrio de la Carbonera, and never was included in the Marina or Puntilla. The land on which it is situated is made land. We are of opinion that the mistake in the proclamation, which is evident, makes no difference; but it is not for us here to decide to which of the two governments the tinglado shed with the lot and its bulkhead actually belongs, because the national government has been and is in possession of all of the same, and the President, by the proclamation aforesaid, reserved, as will be noticed, "The right, until otherwise ordered, to the use of the lots and buildings . . . now used and occupied by the custom authorities for customhouse purposes;" so we feel that this language includes the tinglado shed and the lot it is situated on, as well as the bulkhead in front of it; and that the national government is therefore entitled to the exclusive right to use the shed, bulkhead, and lot, and to the prior right to use, and even to the exclusive use, of said bulkhead if it requires the same and so desires; but we are further of the opinion that the local insular government, under § 13 of the organic act afore-

said, and the said act of Congress of July 1st, 1902, is entitled to the control and management of said bulkhead and landing place in question as against all save the United States itself, and certainly as against the complainant here if it so desires, be-cause said bulkhead is a part of the general water front of the San Juan harbor, from which the insular authorities have not been excluded when the same is not in use by the United States. This we think disposes of complainant's contention that the landing place in question can be controlled only by the United States.

The main contention of the complainant is that he is pos-sessed of a franchise to run a ferry from Cataño, on the south side of the bay, to the city of San Juan; that the right includes a right to land, as set out in the bill, and that he has a right to so continue to use said landing space for all of the unexpired term of his railroad franchise, which he claims is still some-forty years in the future.

It appears that about the year 1880 the complainant, Valdés, procured a franchise from the then Spanish authorities to build a little 4 or 5-mile tramway or narrow-gauge railway from Bayamón to Cataño, on the south side of the bay of San Juan. His charter provided that the motive power might be steam, or the government might reduce it to horse power if it saw fit. Mr. Valdés got a seventy-year franchise for this little tramway, and took the same in his own name, although he and his neigh-bors organized a corporation to build the road. It was built and put in operation and so continued for several years, but later, becoming indebted, complainant, who owned the franchise himself, became possessed of all of the property of the railroad corporation in about the year 1886 or 1887.

A good statement of the facts regarding the granting of this

Valdés y Cobián v. Grahame.

franchise, the construction of the railroad, and the final acquiring of the whole of the same by complainant is set out in an opinion we rendered on June 1, 1907, in a suit by parties who claimed still to be stockholders in that corporation, against Mr. Valdés, entitled Llaneras v. La Compañia Férrea del Oeste, ante, p. 76.

At the time that Valdés procured this franchise to build the railroad and succeeded in getting it built with the help of his neighbors, as stated, he conceived the idea of establishing a line of ferryboats from Cataño across the bay to San Juan in connection with it. He had, it seems, previously secured the right to erect a little pier or wharf on the shore at the south side of the bay where his railroad began or ended. For some reason, either because such applications could not be made jointly, or because he did not think he needed a franchise therefor, and that he could run his ferry under the general navigation or water laws of the country, complainant did not get any franchise to run the steamboats at the time his railroad franchise was granted to him, but, in 1880 and 1881, he went through what appears to be a most annoying series of proceedings before the local boards and officials, where for many months he was ping-ponged from one to the other, with all sorts of red-tape references, in his efforts to get a right to land his boats at the landing place in question, or, as he contends, a franchise therefor. In all of his petitions requesting the right to get this landing place for this ferry of his, he set out the merits of the railroad he was to establish, and the fact that it was a part of the main carretera or public road between Mayaguez and San Juan, and generally tried to impress the authorities with the expediency and necessity for, as well as the public benefit to arise from, the same, and the necessity of having a landing place for his ferry

in connection with his said tramway or railroad.   His applica-
tion, with all its certificates, recommendations, and approvals,
was finally referred to headquarters in Spain; but it came back
from the officials under the King with the statement in sub-
stance, as we gather from it, that, as there was nothing requested
involving royal prerogative, it was matter for the local authori-
ties in the island to attend to; and that, if there was no reason
to the contrary, he could be permitted to land his boats at the
space in question under certain restrictions.   The language in
some of the documents, referring the matter from one to the
other, is peculiarly significant in the light of the present claim
of the complainant.  Let us refer to the substance of some of it:
It appears that on the 25th of September, 1880, complainant,
Ramón Valdés, petitioned the then-existing bureau of public
works of Porto Rico with regard to a landing place for this
ferry, and that the bureau, when transmitting the same to the
governor, quoted from the petition, and stated that Valdés
wanted a space assigned to him on the public wharf where he
could land his steamboats, and set out that such a space could
not be given to him in the little inlet called "dársena" because
it would disturb the little boats that were engaged in ferrying
across the bay; but that it might be convenient to authorize him
to use a space of 12 meters along the angle of the bulkhead or
cement wall, beginning at the dársena and running east.   The
bureau official further set out that of course Mr. Valdés's boats
had the same right to the use of the public wharf as any others,
but that, as they made frequent trips, they could be considered
rather permanent.   That the place indicated on the bulkhead
not being well suited to the anchorage or the loading or unload-
ing of the coastwise or high sea vessels, but particularly well
adapted to the passenger service of a ferry line and to the entry

Valdés y Corbián v. Grahame.

and exit of stock and carriages to the steamboats, etc., he recommended that Valdés be permitted to land at this particular place, etc. However, this official was particular to set out that it should be understood, nevertheless, that the right to this free space should be subject to all proper interruptions by the general service, because otherwise a privilege in favor of the steamboats from Cataño might be established, to the injury of the other craft that frequented the port. This bureau official also recited in this same communication that the construction of the tramway was authorized by a royal order of the 20th of February of that same year, and recited also that this royal order stated that, in order to get the right to build the wharf at Cataño, the petitioner should proceed under the then-existing law of waters, which, the bureau claimed, Valdés was then proceeding to do; but that, in the latter petition, he had failed to ask for the right to land his steamboats at San Juan so as to carry his project of the ferry and railroad to full realization, from which great benefit, etc., would result to the public. Then the bureau proceeded to recommend to the governor that, as it was not inconvenient to assign the extreme end of this cement bulkhead next to the dársena to Valdés, and that it ought to be done, but under conditions which were set out about as follows:

1. That he might be permitted to utilize a space of 12 meters, which shall be designated to him by the marine authorities, on the western angle of the cement bulkhead in question, for the landing of his boats between the capital and Cataño.

2. That such boats should approach and depart from the said space with as little inconvenience to the rest of the traffic as possible.

3. That, in order to hold the right to this free space, he should constantly have two steamboats in service; and that, if

Valdés y Cobián v. Grahame.

the ferry service was interrupted for more than 48 hours, it would give a right to any other craft to use the space, and Valdés should not have the right to again occupy it until such craft had discharged or taken on their cargo; and

4. That the steamboats thus used and all their work in and about the embarking and discharging of freight and passengers should be subject to the general police regulations of the port.

It seems that the governor general favorably considered this recommendation of the bureau, and, after getting the opinion of several other officials and bureaus, the matter was sent to Spain and came back as stated; but the minister of ultramar, in Spain, when sending it back under orders of the King, stated that, as the petition treated only of an authorization for the landing of the boats, there was no necessity to make a concession of the referred-to part of the public wharf, because some time the concessionee might claim such concession as a right to the indefinite occupation of the same; and that the King therefore requested the minister to notify the governor that the matter should be settled by the proper officials having charge of the police service of the port of the capital. An order was then sent out to the proper local official to mark off the 12 meters referred to, which was done, and Valdés soon thereafter established his ferry line, and has continued it ever since, although he claims he never had but one boat in actual service at any one time. It is in evidence, though, that he had two boats in his possession after 1891, but he claims to only have used one of them at a time except on special occasions.

The exhibits in the cause showing the procedure leading up to the securing of the railroad or tramway franchise by complainant, and leading up to the securing of the permission to land his ferryboats on the San Juan side of the bay; are numer-

ous and show the transactions in great detail, because every officer to whom any of the matters were referred copied out everything connected with the matter when transmitting it to some other officer for the latter's action. An examination of all of these exhibits has taken time; but, on the whole, when one understands the purport of the action taken, the result proves to be quite simple.

Some years after complainant had his ferryboats running, it transpired that he had to do considerable dredging in and around the little wharf he has on the south side of the bay, at Cataño, and in the shallow part of the bay itself for a considerable distance to make it possible for him to float even the light-draft ferryboats he uses. At one time he went to considerable expenses in cutting through a sand bar to straighten and shorten the route, and probably from time to time through the years has had more or less dredging to do, to keep the channel open from the deep part of the harbor to the place where he lands at Cataño. In order to get the right to do this dredging and to cut through this sand bar, as shown by the exhibits filed, he had to go through just about as much red-tape procedure with the then local Spanish government as he did when he got the right to land his ferryboats at San Juan, several years before. The examination of these Spanish exhibits has also taken considerable time.

Some of the affidavits filed with the bill, and the oral testimony of several of the witnesses introduced, tended to show that these ferryboats were in an extremely dangerous, unsanitary, and generally bad condition. In fact, the whole trouble is brought about by this claim on the part of the insular authorities, and they give it as a reason for their action. By consent of both sides the court itself took a trip over the boats

III. PORTO RICO—28.

Valdés y Cobián v. Grahame.

and the tramway for ocular inspection. From the evidence sub-
mitted in the cause and from such inspection we are able to
state that:

Of the two little steamboats that he uses, one was built in
the early eighties, about twenty-seven years ago, and the other
was built in 1891, or about seventeen years ago. They are each
about 75 feet long and have propellers at both ends, so they
do not have to turn around when leaving the wharf on either
side of the bay. They have a sort of apron attached at each end,
which drops down on the bulkhead or wharf as a gangway when
the boat lands. This apron is simply lifted by a crude wind-
lass when the boat is about to depart. A little narrow-gauge
track is laid in the center of each boat and out over this apron,
on which small freight cars are pushed onto the ferryboats, and
pushed off at the Cataño end, where they are taken by the little
railroad and hauled to their destination. The center of each of
the boats, of course, is open for this freight track, and one side of
each boat is partitioned off like any ferryboat in the big cities, for
passengers, while the other side has no partition between it and
the track, but has a bench along the side of the boat for second-
class passengers, for it seems the passengers are so divided.
Where the partition would be, the hatchways to go down to the
machinery and into the hold of the boat are placed, and, of
course, when a lot of miscellaneous freight as well as when cattle
and other live stock are carried in the center of a boat as small
as those are, conditions cannot be very pleasant for at least the
second-class passengers. The boat in use at present is the En-
carnación. The sanitary arrangements on it are, in our opin-
ion, wholly inadequate, and the boat itself is badly worn and a
good deal of the iron work about it is of the crudest kind. The
boiler and machinery in the hold and the hold itself were not

Valdés y Cobián v. Grahame.

in very good condition. On the whole, as to this boat, even making due allowance for the fact that one should not expect a ferry service here quite equal to what is afforded in the larger cities of the States, where the volume of traffic is very great and the profits presumably correspondingly large, still it was plainly manifest that this boat in particular was wholly inadequate, and as to the hold, in particular, unnecessarily dirty and unsanitary. We examined the other boat, the Valdés, on the stocks, and it appeared to us, while it was an older boat, that the complainant was making good-faith efforts to put it in at least reasonably good condition. We crossed the harbor on the Encarnación in the middle hours of the day, and each trip the boat was crowded with freight and passengers. We counted about ninety passengers on each trip.

It is our opinion that the permit granted complainant by the Spanish authorities to land these boats contemplated that he should have two boats in actual use, not merely in service, one from each end all the time, and we are of opinion that it is now absolutely necessary that such should be done in order to accommodate the increased traffic. We cannot agree with complainant's contention that the specifications in the Spanish permit meant that he should simply have or own two boats; on the contrary, we think it was intended that he should have them both together in actual use and service with reasonable continuity. But it is immaterial which was intended, as we hold that the local authorities have full power to require any ferry owner serving the people of San Juan to provide sufficient facilities to accommodate the traffic. A former attorney general of Porto Rico, Hon. James S. Harlan, now a member of the Interstate Commerce Commission, wrote a careful opinion under date of July 29th, 1902, 1 Opinions A. G. P. R. 44, as

Valdés y Cobián v. Grahame.

to insular control over harbors, etc., in the island, that is profitable reading and with which we agree in the main, wherein he maintains the doctrine we are now stating. See also Id. p. 147.

It is no part of our duty in this suit except incidentally to speak of the railroad or tramway, although we might do so because of the necessary intermingling of the two enterprises, and the consent that we should inspect both. At any rate, we went over it, and are of the opinion that its rolling stock is too old and is out of date. Things connected with the road are not kept tidy or neat, which is so easy to do in this fine climate. There are no proper safeguards in and about the cars or trains. The stationhouse at Bayamón is a first-class one under the circumstances, but its sanitary arrangements are not adequate. We are satisfied that recently, at least, young Mr. Valdés, complainant's son, who is in charge, is making commendable efforts to improve the service, but it is hard for him to do so, with the poor help and ancient boats and rolling stock at his disposal.

After making all due allowance for the mild climate and the large number of poor people who ride over this railroad and ferry, but keeping in mind the very large traffic that now has to be provided for, we are of the opinion that both the railroad and ferry are not as up to date as they ought to be, particularly the railroad. It is our opinion that the owner does not spend enough money out of the earnings or proceeds of the business to employ the proper sort of help or clean up things and to renew the boats, machinery, and rolling stock as required, and to keep all in proper sanitary condition. A few thousands of dollars intelligently expended would keep both the railroad and the ferry line in at least fair condition for the kind they are. Neither one is what it ought to be, or could be with proper care, even of the kind it is, at the present time. Mr. Gromer, of the

Valdés y Cobián v. Grahame.

executive council, while on the stand, exhibited a sincere spirit of honesty and fairness toward complainant, and showed that the local government had no desire to harass or embarrass him in the conduct of his business, and only desired that he should pay some proper regard to the safety, comfort, and convenience of the public. Notwithstanding our very high regard for complainant personally as an enterprising man and a public-spirited citizen, we are forced, from our inspection and the evidence, to fully agree that the local government and the public, certainly as to these particular enterprises of his, have good cause for complaint, because of the dangerous and unsanitary condition of this ferry line and this little tramway, and the slipshod manner in which both have been conducted, all of which could be and ought to be improved by the expenditure of a proper proportion of the earnings of the traffic. Most of the rolling stock of both enterprises looks as if it were the same that was procured and put into use nearly three decades ago when the railroad and ferry were first built and started.

We now come to pass upon the question as to whether or not complainant's allegations that he is possessed of a ferry franchise can be sustained, and we unhesitatingly say on the evidence before us that it cannot. We cannot see how it can be contended after a reading of the Spanish exhibits introduced, that he has any franchise to run the ferry, or anything more than a mere revocable license or permit. The Spanish government evidently considered that there was no necessary connection between his tramway and the ferry, and all through the documentary evidence as to the ferry it can be seen that the government did not intend to and did not consider that it had conferred upon him any definite or irrevocable franchise to

run these ferryboats, or had given him any irrevocable right to land his boats on the 12 meter space in question.

Franchises in monarchies are usually prerogatives of the Crown; and in republics are concessions or authorizations of the sovereign people. In either case they are never presumed, and he that claims to possess one has the burden upon him to show its existence. It was held in United States v. Elder, 177 U. S. 104, 44 L. ed. 690, 20 Sup. Ct. Rep. 537, citing United States v. Ortiz, 176 U. S. 422, 44 L. ed. 529, 20 Sup. Ct. Rep. 466, that the person claiming a Mexican land grant had the burden upon him to establish, by a preponderance of the proof, the validity of his asserted title.

And it was held in the case of Slidell v. Grandjean and in several other cases all tried together and reported in 111 U. S. 413, 28 L. ed. 321, 4 Sup. Ct. Rep. 475, that, in case of doubt, a legislative grant should always be construed most strongly against the grantee. In fact, the general rule is to construe grants of ferry franchises strictly. Fanning v. Gregoire, 16 How. 524, 14 L. ed. 1043. So, if there were any doubt as to whether the Spanish authorities had granted complainant a franchise to conduct a ferry during the life of his railroad franchise, or only a mere permit or revocable license, under the rule last quoted, we would be obliged, from a reading of the exhibits here, to hold against the franchise. But the fact is, we have no doubt whatever about it, and cannot see how anybody can have.

Of course, the difference between the two privileges or rights is great. "A grant passes some estate of greater or less degree, must be in writing, and is irrevocable unless it contains words of revocation; whereas a license is a personal privilege, can

Valdés y Cobián v. Grahame.

be conferred by parol or in writing, conveys no estate or interest, and is revocable at the pleasure of the party making it." This latter is the language of the Supreme Court of the United States in De Haro v. United States, 5 Wall. 599, 627, 18 L. ed. 681, 688, cited in Peabody v. United States, 175 U. S. 550, 44 L. ed. 268, 20 Sup. Ct. Rep. 219.

But, even though it could be held that complainant here is possessed of a franchise that has any number of years yet to run, still, that would not imply that he is not subject to reasonable regulation and proper control under the regular police power for the safety and convenience of the community, possessed by the local government, and this would be so even if such franchise was an exclusive one. It was held by the Supreme Court of the United States in Louisville Gas Co. v. Citizens' Gaslight Co. 115 U. S. 683, 29 L. ed. 510, 6 Sup. Ct. Rep. 265, that, in granting the exclusive franchise to supply gas to a municipality and its inhabitants, a state legislature does not part with the police power and duty of protecting the public health, the public morals, and the public safety, as one or the other may be involved in the exercise of that franchise by the grantee.

So far has this doctrine of the power of the state or local government to control ferry keepers been carried, that the Supreme Court of the United States in Wiggins Ferry Co. v. East St. Louis, 107 U. S. 365, 27 L. ed. 419, 2 Sup. Ct. Rep. 257, held that a state has power to impose a license fee, either directly or through one of its municipal corporations, upon ferry keepers living in the state for boats which they own and use for conveying from, and landing in, the state, passengers and goods across a navigable river to a landing in another state. Yet one would, on first impression, be inclined to think

that this was an interference with interstate commerce, yet it was, as stated, sustained by our highest court.

Any person who desires to consult a treatise upon the powers of the local government over ferry lines, and the duties such concerns owe to the public, is referred to the brief on that subject, to be found as a footnote to the case of Sistersville Ferry Co. v. Russell, 59 L.R.A. 513. It is a most exhaustive exposition of the law on that subject. In one of the notes in that brief, on page 546 of that work, quoting from the great case of New York v. Starin, 106 N. Y. 1, 12 N. E. 631, it is stated that "the holder of a ferry franchise owes certain duties to the public because of the privileges given him, and he has certain rights in return, which are accorded him as compensation for the duties performed. Among his duties are to provide adequate means for accommodating the traffic, and to have the ferry in readiness for use at all times when it could reasonably be demanded under all the circumstances of the case." On page 542 of that same work is to be found a citation from Kerby v. Lewis, 6 U. C. Q. B. O. S. 207, where it was held by that Canadian court that "the government exercises supervision of ferries for the purpose of insuring to travelers the manner of crossing narrow waters without delay, in safe boats, managed by experienced persons, upon the payment of reasonable tolls."

It will be noticed in our statement, supra, that the minister of ultramar when sending back Mr. Valdés's request for a landing place, to the authorities in the island, used the significant language that the place where he was asking to be permitted to land his boats should be subject to all proper interruptions of the general service of the port, and that the King had said that there was no necessity for him to exercise royal pre-

Valdés y Cobián v. Grahame.

rogative and make a concession of the portion of the public wharf, because some time in the future the concessionee might claim a right to the continuous and indefinite occupation of the same. We would not need to cite a single authority after reading these papers in order to see that complainant possesses but a mere permit or revocable license to land his boats at the place in question; and, with all due regard, we cannot imagine how either complainant himself or his counsel can ever have brought themselves to believe that complainant possessed anything more. The papers do not show it, but they do, we think, show the contrary. Then, where is the authority for asserting it? Not so with his railroad franchise,—that appears to be a regularly granted charter. It was published, as required by the Spanish law, here at San Juan, in the official Gazeta. But we are not passing on his rights as to his railroad, as it is not fully before us, and only mention it to show the difference incidentally apparent in the concessions or grants of the Spanish authorities to him.

Therefore, as we cannot see that he is possessed of any franchise or vested right to run this ferry line, he has no legal cause to complain of the action of the defendant, Grahame, in obeying the executive council of Porto Rico in canceling his permit or license to land his ferryboats at the place in question. We have made a considerable study of this case and the facts and circumstances surrounding it, and besides the examination we made of the pleadings and exhibits, and the attention we have given to the oral evidence presented in open court, we have seen and personally examined the ferryboats. From all of this we have no hesitation in saying that, in our opinion, the action of the executive council is reasonable. As before stated, they appear to have no desire to oppress complainant in any way, but

Valdés y Cobián v. Grahame.

just simply desire to bring to his mind the important fact that, even if he possessed vested rights under a definite franchise, he still has duties to perform toward the public which the police power of every jurisdiction can enforce. It need not, of course, be suggested, as it suggests itself, that it is more or less arrogant and offensive for one claiming to be working under a public franchise to resent reasonable requests of proper authority, that he keep the service up to reasonable public requirements.

As to the powers of the executive council generally in the island of Porto Rico, we took occasion, in an opinion filed December 31, 1906, in the case of Arpin v. Porto Rico Power & Light Co. 2 Porto Rico Fed. Rep. 33C, to express ourselves pretty fully on the question, holding that their powers were ample; in fact, quite extensive; in other words, "that it is a sort of board of managing directors of the affairs of the island;" and, under the law, we think this is so in a much more than ordinary sense as to the rights of corporations or others who serve the public. We do not think this power of the executive council is limited or curtailed as to this case by the closing words of § 13 of the organic act above quoted. The executive council, in some instances, and the legislative assembly, in others, have an official duty to perform to see to it that the public safety and health is not endangered by those serving the public as common carriers, or in other like capacities.

The briefs of counsel have driven us to an unnecessarily wide examination of authority; but, as we went through it, we became more than ever before impressed with a few well settled principles of law regarding national and local power as to navigable waters and harbor areas, and the powers of both governments over ferries and landing places.

The Attorney General of the United States, in an opinion

Valdés y Cobián v. Grahame.

delivered July 27, 1899, with reference to the river Plata, in Porto Rico, and the water power thereof, where this same complainant, Ramón Valdéz, claimed a franchise coming to him from Spanish days (22 Ops. Atty. Gen. 548), states plainly that of course this government will respect all rights possessed under Spanish law at the date of the Paris treaty, but that, if the right had not been completed by the action or the assent of the granting authorities of Spain at that time, that then such right is not vested, but inchoate; etc.; and he cites the Supreme Court of the United States in Ely v. United States, 171 U. S. 220, 43 L. ed. 142, 18 Sup. Ct. Rep. 840, in support of the well-known doctrine that, "that which was good before the treaty should be good after;" and goes further and states that the converse of this proposition is undoubtedly true; *viz.,* that, that which the law before the cession would not enforce, will not be enforceable as a matter of right after the cession."

Now, as we see it, Mr. Valdés possessed no irrevocable franchise, either to run a ferry or land his boats at San Juan during the Spanish *régime,* and, as it is not in evidence that he has obtained any from the local or national authorities since American occupation, he cannot be in any better position now, and the statute of limitations, of course, does not run against the government. The only effect long acquiescence of a government under any particular state of facts has, where there is no record evidence at hand, is that, in a proper case of that kind, a grant will be presumed against it. In the case at bar the record is before us, and its terms do not sustain the contention of complainant. Clark v. White, 5 Bush, 353; Sistersville Ferry Co. v. Russell, 59 L.R.A. 537, note.

It is in evidence that complainant has recently had his ferry boats inspected and passed by national inspectors. We do

not think that fact concerns the issue here very much, because, even though he had a ferry license from the local authorities and a right to land on each side of the bay from the same source, still, he could not navigate the national waters of the bay without this national inspection and permit, which is paramount, and, as ferrying across the bay is in no sense interstate commerce, the national permit will not authorize him to either conduct a ferry as a business, and take tolls therefor, or to land on either side of the bay regularly as a toll-taking ferry, even if he owned the fee to the landing places. Chiapella v. Brown, 14 La. Ann. 185; Marshall v. Grimes, 41 Miss. 27.

It is apparent from the whole course of the action of Congress towards Porto Rico, that it intends the local legislature, which, in some instances, means the executive council alone, to have practically as much police power as the legislature or other authorities of a sovereign state would have in regard to local matters, as contradistinguished from those things which are national. Arpin v. Porto Rico Power & Light Co. 2 Porto Rico Fed. Rep. 314, supra.

It was held in Olsen v. Smith, 195 U. S. 332, 49 L. ed. 224, 25 Sup. Ct. Rep. 52, as recently as 1904, that state laws regulating pilotage, although regulations of commerce, fall within the class of powers which may be exercised by the states until Congress has seen fit to act upon the subject. And it is stated by Mr. Tiedeman in his work on State & Federal Control of Persons & Property, vol. 2, p. 1076, § 224, that, as long as Congress does not exercise this implied power, it rests with the states to provide all those local regulations of the use of harbors which are aids to commerce, rather than restrictions or interruptions, and which go far towards eliminating the chances of injurious accidents which are more or less present in the absence of police

Valdés y Cobián v. Grahame.

regulations. Thus, it is lawful for the state or municipal corporation to prescribe when a vessel may lie in the harbor, how long she may remain there, what light she must show at night, and establish other similar regulations without coming into conflict with any law of Congress; citing numerous decisions.

In the case of Vanderbilt v. Adams, 7 Cow. 349, an act of the legislature of the state of New York was sustained which was to regulate the anchoring and movements of all ships and vessels in the current of the East and North rivers, and to remove from the various wharves such vessels as were not employed in discharging or receiving freight, in order to make room for vessels waiting for an opportunity to come to the wharf.

Of course, there are many laws which state and territorial legislatures might attempt to pass regarding national matters which would be invalid, especially where they attempt, by the exercise of the police power or in any other way, to interfere with interstate commerce; or, in a place like Porto Rico, to in any way contravene any national law.

We are aware that there is a good deal of authority which holds that even a mere license is irrevocable where expense is incurred under it, and it is presumed, as this complainant purchased two steamboats and went to a lot of expense in dredging, as well as constructing a small wharf in Cataño, that he claims even his mere permit or license to be, for that reason, irrevocable during the life of his railroad franchise, which, as stated, it is said has some forty years yet to run. It will be found on an examination of the law as to this subject that even where the courts hold to that rule, it is usually between private parties, and not as against the government; but the courts are not unanimous in favor of that rule even as to private parties. It is stated under the head, "License," in vol. 18 of the Am. &

Eng. Enc. Law, 2d ed. p. 1146, that, according to the prevailing view of the courts in England and a large number of the courts of the states of the Union, "neither the execution of the license, nor the incurring of expense [under it], nor both combined, affect the right of the licensor, and he may revoke [the same] under all circumstances."

That work cites numerous cases in support of this view of the law from England 'and from Connecticut, Delaware, Illinois, Maryland, Massachusetts, and a dozen or more other states. Even if such a rule could, notwithstanding the record, be held to have force here, the equities of the case are, in our opinion, entirely against complainant, because, no matter what expense he may have gone to in the first instance, as to his ferry line, he has had ample time in the twenty-eight years he has been conducting the same to recoup himself. But we hold to the doctrine, especially in this sort of a case, and under the sort of a permit that we see was granted here, that the permit or license is revocable at any time, without reference to what the grantee may have done under it. It is not to be presumed, of course, and in fact, as stated, none appears to exist, that the local authorities have any desire to injure complainant, or to do ought save to force him to respect the rights of the public; and he will probably find it an easy matter to procure a proper permit or franchise to conduct his ferry whenever he exhibits a proper spirit to comply with the public requirements. In fact, it is in evidence that the local authorities offered to grant him a franchise, and that considerable negotiations looking to that end took place between the parties. Mr. Gromer claims that these proceedings might never have been resorted to were it not that he and the other members of the executive council understood

complainant to refuse to acknowledge the right of the local government to regulate his ferry line in any manner.

Therefore, for the reasons herein set forth, the exceptions to the answer of the defendant will be and they are hereby overruled so far as this court is concerned, *nunc pro tunc* as of the date of the filing of the same, and the relief prayed for will be denied, and the bill dismissed with costs. However, as this is a final disposition of the cause, from which we believe an appeal lies to the Supreme Court of the United States, there being much more than $5,000 in value involved, the same will be granted to the complainant if applied for, with the privilege of giving a supersedeas bond in the premises in an amount to be fixed by the court, if the appeal shall be taken.